UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BARBARA HANOVICH,                           CIVIL NO. 07-1527 (ADM/JSM)

     Plaintiff,

v.                                          REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

Defendant has denied Plaintiff Barbara Hanovich's application for disability insurance benefits (DIB) under the Social Security Act, 42 U.S.C. § 423.  Plaintiff has now instituted this action seeking review of the denial of benefits.  The matter is now before the Court on cross-motions for summary judgment.  Plaintiff is represented by Frank W. Levin, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has jurisdiction of the matter pursuant to 42 U.S.C. § 405(g), and it is properly before the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72(b).  For reasons discussed below, it is recommended that Plaintiff's Motion for Summary Judgment [Docket No. 8] be GRANTED in part and DENIED in part; and Defendant's Motion for Summary Judgment [Docket No. 11] be DENIED.

## I.     PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for social security disability benefits on February 18, 2003, alleging disability since December 31, 1987.  (Tr. 61-64, 79).  Plaintiff first met the insured status test on January 1, 1991, and her insured status expired on March 31, 1996.  (Tr. 67, 94).  Plaintiff's application was denied initially, and

upon reconsideration. (Tr. 28-32, 35-39, 41-43). Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 44). A hearing was held before Administrative Law Judge Diane Townsend-Anderson on March 23, 2005. (Tr. 1160-1201). On October 24, 2005, the ALJ issued an unfavorable decision. (Tr. 18-25). The Social Security Administration Appeals Council denied a request for further review. (Tr. 6-8). The denial of review made the ALJ's findings final. 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

Plaintiff has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g). [Docket No. 1]. The parties now appear before the Court on Plaintiff's Motion for Summary Judgment [Docket No. 8] and Defendant's Motion for Summary Judgment [Docket No. 11].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." 42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least

2

12 months or be expected to result in death.   42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. § 404.1509.

### A.     Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.   20 C.F.R. § 404.909(a)(1).   A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. § 405(b)(1); 20 C.F.R. § 404.929.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. § 404.1520; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B.     Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-

404.982.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

### C.   Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of plaintiff's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d

4

934, 939 (8th Cir. 1994). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. § 404.1512(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some

other substantial, gainful activity.   <u>Martonik v. Heckler</u>, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   <u>The ALJ's Findings of Fact</u>

The ALJ concluded that plaintiff was not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223.  (Tr. 23).  The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on January 1, 1991, and continues to meet them only through March 31, 1996.

2. The claimant has not engaged in substantial gainful activity at any time since December 31, 1987, her alleged onset date of disability.

3. The medical record establishes that during the period from December 31, 1987 to March 31, 1996, the claimant was severely impaired by peptic ulcer disease, bilateral keratoconus and keratoconjunctivitis sicca and bilateral cataracts, status post cataract extraction and lens implant, and corneal transplant, and degenerative disc disease of the cervical and lumbar spine, with disc herniation at L4-5, and arthralgia, possible systemic lupus erythematosus, with complaints of joint pain, and stress urinary incontinence, but that she did not have an impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. The claimant's subjective complaints and functional limitations are inconsistent with the record as a whole on or before March 31, 1996.

5. During the period from December 31, 1987 through March 31, 1996, the claimant retained the residual functional capacity for work requiring lifting twenty pounds occasionally and ten pounds frequently, with no constant visual acuity such as that required by [an] individual using a microscope or computer an entire work day, no exposure to temperature or humidity extremes or bright sunlight, no work around heights, ladders, or scaffolds, no foot pedal manipulations, no power gripping, twisting or pounding, and only occasionally bending, stooping, crouching, crawling or twisting.

6.   The claimant's impairments precluded her from returning to her past relevant work from December 31, 1987 through March 31, 1996.

7.   During the period from December 31, 1987 through March 31, 1996, the claimant was a younger individual to an individual closely approaching advanced age, with more than a high school education, an elementary teaching certificate, and a history of skilled work.

8.   Considering the claimant's residual functional capacity, age, education, and past work experience, during the period from December 31, 1987 through March 31, 1996, there were other jobs existing in significant numbers in the national economy that the claimant would have been able to perform, including a classroom teacher, case aide, or food packager.

9.   The claimant was not under a disability as defined in the Social Security Act at any time on or before March 31, 1996.

(Tr. 24-25).

B.   **The ALJ's Application of the Five-Step Process**

At step one of the disability evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity.   20 C.F.R. § 404.1520(b).   (Tr. 19).   At the second step of the evaluation, the ALJ found that plaintiff had severe physical impairments of peptic ulcer disease, bilateral keratoconus[1] and keratoconjunctivitis sicca[2] and bilateral cataracts, status post cataract extraction and lens implant, and corneal transplant, and degenerative disc disease of the cervical and lumbar spine, with disc herniation at L4-5, and arthralgia,[3] possible systemic lupus erythematosus,[4] with

---

[1]   Keratoconus is a noninflammatory protrusion of the central part of the cornea, which may cause marked astigmatism.   MOSBY'S MEDICAL, NURSING & ALLIED HEALTH DICTIONARY 1998 (5th ed. 1998) ("hereinafter "MOSBY'S").

[2]   Keraconjunctivitis sicca is dryness of the cornea caused by a deficiency of tear secretion.   MOSBY'S at 895.

[3]   Arthralgia is pain in the joint, especially one not inflammatory in character. STEDMAN'S MEDICAL DICTIONARY 149 (27th ed. 2000) (hereinafter "STEDMAN'S").

complaints of joint pain, and stress urinary incontinence.   At the third step of the evaluation, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 19).

At the fourth step of the evaluation process, the ALJ noted that plaintiff has been unable to work since December 31, 1987, based on subjective complaints of extreme fatigue, loss of vision, chest pain, joint and muscle pain, back and leg pain, muscle spasms, numbness in her hands and feet, swelling in her hands, and difficulty concentrating due to pain medication.   (Tr. 19).   Thus, the ALJ considered plaintiff's subjective complaints in light of the record as a whole and found that plaintiff had the following residual functional capacity:

> "[Plaintiff could] perform work requiring lifting twenty pounds occasionally and ten pounds frequently, with no constant visual acuity such as that required by [an] individual using a microscope or computer an entire work day, no exposure to temperature or humidity extremes or bright sunlight, no work around heights, ladders, or scaffolds, no foot pedal manipulations, no power gripping, twisting or pounding, and only occasionally bending, stooping, crouching, crawling or twisting.

(Tr. 19-20).

In support of the RFC, the ALJ first addressed plaintiff's peptic ulcer disease and noted that there were significant gaps in treatment for this condition from January 1993 through November 1996.   (Tr. 20).   The ALJ noted that on the few occasions where

---

4       Systemic lupus erythematosus is an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigueability, joint pains or arthritis, diffuse skin lesions, lymphadenopathy, pleurisy or pericarditis, glomerular lesions, anemia, and hyperglobulinemia.  STEDMAN'S at 1037.

plaintiff's abdominal pain was severe, it was related to her being out of, or noncompliant with her medication.  Id.  The ALJ also noted that plaintiff traveled quite a bit in this timeframe, and such excessive travel was inconsistent with incapacitating abdominal pain.  Id.

Additionally, the ALJ cited evidence that, although plaintiff had a live-in housekeeper, she did much of the housework herself.  (Tr. 20).  The ALJ further noted that in 1991, one of plaintiff's physicians noted that she was remarkably productive despite her complaints of ongoing symptoms.  Id.  Plaintiff was hospitalized for epigastric pain on only one occasion in 1988; there were minimal objective findings of "a very benign appearing ulcer" in January 1990; and an active ulcer, which was 75% healed in April 1990; no ulcer was seen in August 1991, and biopsy was negative in October 1991.  (Tr. 20-21).  Further, although plaintiff was diagnosed with antral gastritis with ulceration in March 1996, erosions were noted only in April 1996.  Id.  The ALJ concluded that this evidence is inconsistent with a disabling impairment.

The ALJ next considered plaintiff's impairments of degenerative disc disease, arthralgia, and joint pain.  (Tr. 21).  The ALJ noted that when plaintiff saw a rheumatologist, Dr. Paul Waytz, on November 12, 1986, examination revealed tenderness of the PIP, MCP and MTP joints, with very low grade, scattered synovitis[5], tenderness of the low back, and no effusion.  Id.  Plaintiff was diagnosed with arthralgia, and after treating with Plaquenil for one month, she was less achy, and had quite a bit of energy.  Id.  At that time, plaintiff had only some spasm of the low back, and no active

---

[5]     Synovitis, when unqualified, is the same as arthritis.  STEDMAN'S at 1773.

synovitis.  Id.  Dr. Waytz noted that plaintiff was going to Southeast Asia at the end of February 1987.

Plaintiff did not return to Dr. Waytz until two years later, January 4, 1989, at which time she complained of arthralgia in her hands and feet, and had some muscle spasm in the upper back and neck, but no synovitis, and good range of motion of the joints.  (Tr. 21).  The ALJ noted that plaintiff did not return to Dr. Waytz with any further joint symptoms until March 7, 2001, five years after her disability insured status expired. Id.  The ALJ then considered Dr. Waytz's letter dated May 6, 2005, in which he opined that plaintiff would be unable to perform even simple unskilled sedentary work on a full-time sustained basis as of March 31, 1996.  Id.  However, the ALJ found this opinion to be inconsistent with Dr. Waytz's treatment notes containing only minimal objective findings during three visits from November 1986 through January 1989.[6]  Id.  Thus, the ALJ did not give Dr. Waytz's opinion substantial weight.  Id.

The ALJ noted that the record also contained a statement from Dr. Gerald Mullin, plaintiff's rheumatologist from 1975 through December 2000.  (Tr. 21)  Dr. Mullin opined plaintiff would have been unable to perform even simple unskilled sedentary work on a full-time sustained basis as of December 31, 1995.  Id.  The ALJ did not give this opinion substantial weight because the record did not contain any records from Dr. Mullin, and other medical evidence was inconsistent with complete disability.  Id.

The ALJ next considered plaintiff's report of neck pain and foot fracture on July 16, 1996, three-and-a-half months after her insured status expired.  (Tr. 21).  The

---

[6]     Plaintiff also saw Dr. Waytz on three occasions in 2001, but his treatment notes are not legible.  (Tr. 605-07).

ALJ noted plaintiff had reported working four to five hours a week at her own travel agency, and denied any work restrictions. Id. The ALJ found that Dr. Kraker's examination of plaintiff revealed tenderness of the cervical and thoracic spine, and left trapezius, but normal range of motion of the shoulders and neck, no muscle spasm, and normal strength, sensation, and reflex of the upper extremities. (Tr. 21-22). Plaintiff's lumbar spine was also tender, but with normal range of motion, normal strength, sensation, and reflexes. (Tr. 22). X-rays of her cervical spine showed degenerative disc disease at C6-7 and L4-5, with no evidence of ankylosing spondylitis.[7] Id. Plaintiff was treated with a Medrol dosepak and Vicodin. Id. In August 1996, plaintiff reported improvement of her pain. Id. She sought no further treatment until January 1998, almost two years after her insured status expired. Id. The ALJ found this evidence inconsistent with disabling neck, back, or joint pain on or before March 31, 1996. Id.

The ALJ considered ongoing references in the record to plaintiff's frequent foreign travel. (Tr. 22) This included trips to Australia in November 1998, China the following week, Thailand in February 1999, Italy in June 1999, Quebec in April 1999, "recent trips to China, South America, and Florida reported in December 1999", a trip to the Himalayas, a trip to the Baltics in May 2000, a trip to Turkey, Greece, and Egypt reported in November 2000, a trip to China in September 2001, a trip to Bangkok in December 2001, a trip to Italy in January 2002, a trip to Amsterdam in May 2002, a trip to China in July 2002, a trip to Thailand in November 2002, a trip to Thailand in

---

[7]     Ankylosing spondylitis is arthritis of the spine. STEDMAN'S at 1679 .

December 2003, and a trip to Bangkok in May 2004.  Id.  The ALJ stated, "[t]hese trips are entirely inconsistent with ongoing disability since December 1987."  (Tr. 22).

The ALJ noted other evidence inconsistent with disabling levels of pain and fatigue.  (Tr. 22).  First, in October 1999, a physical therapist noted that plaintiff's compliance with her individual exercise program was questionable given her work and social calendar.  Id.  Second, in July 2001, a physician noted plaintiff was recently riding a jet ski.  (Tr. 22).  Third, in October 2001, plaintiff's physical therapy was interrupted by her being out of the country for extended periods of time.  Id.  Fourth, in August 2002, a physician noted plaintiff recently did some kayaking.  Id.  The same month, a physician commented that plaintiff was highly active athletically and professionally, running a travel escort and consultation service, and frequently traveling to Europe and Asia.  Id.  Fifth, the ALJ noted plaintiff's husband testified at the hearing that plaintiff did volunteer work for the Guthrie Theater and the American Heart Association.  Id.   The ALJ found this evidence to be inconsistent with disabling levels of pain and fatigue.  Id.

The ALJ next addressed plaintiff's complaints of memory difficulties.  (Tr. 22).  The ALJ noted that plaintiff was not treated for memory difficulties until two years after her disability insured status expired.  Id.  Even then, the results of a neuropsychological examination were consistent with only mild memory impairment.  (Tr. 22).  The ALJ found that the record did not otherwise contain any complaints to treating sources of side effects from medication or reports of concentration difficulties.  Id.

The ALJ considered plaintiff's visual impairments, with vision noted at 20/30 to 20/70 from January 1988 through August 1989.  (Tr. 22-23).  In this timeframe, plaintiff had cataract extraction and lens implant, and a corneal transplant.  Id.  In February

1996, she had left corneal transplant.  (Tr. 23).  Her next surgery, in August 1997, was more than a year after her insured status expired.  Id.  When considered in context of plaintiff's work as a travel escort, the ALJ found plaintiff's visual impairment was not a disabling impairment on or before March 31, 1996.  Id.

The ALJ recognized that plaintiff had surgery for stress incontinence in August 1996, with follow-up bladder retraining.  (Tr. 23).  The ALJ noted that plaintiff did not require follow-up after January 1997, and reported being happy with the results of surgery.  (Tr. 22).

The ALJ considered evidence of plaintiff's earnings records.  (Tr. 23).  Plaintiff's earnings after December 31, 1987, were consistent in that she never earned more than $6,000 a year.  Id.  The ALJ noted that plaintiff's earnings from work as a travel escort were not included in the record, and there are no references to this work activity in any of plaintiff's written reports.  Id.  The ALJ found this lack of documentation to reflect negatively on plaintiff's credibility.  Id.

The ALJ considered the opinions of consulting state agency medical sources, who opined that plaintiff would be able to perform work involving lifting twenty pounds occasionally and ten pounds frequently, with standing/walking six hours in an eight-hour day, sitting six hours in an eight-hour day, and no visual work involving fine print or very close work.  (Tr. 23).  The ALJ found this to be consistent with the medical evidence in the record and granted it substantial weight.  Id.

Thus, based on her analysis of the record as a whole, the ALJ found as of March 31, 1996, plaintiff had the residual functional capacity for work requiring lifting twenty pounds occasionally and ten pounds frequently, with no constant visual acuity

such as that required by an individual using a microscope or computer an entire work day, no exposure to temperature or humidity extremes or bright sunlight, no work around heights, ladders, or scaffolds, no foot pedal manipulations, no power gripping, twisting or pounding, and only occasionally bending, stooping, crouching, crawling or twisting.  (Tr. 23).  In reaching this finding, the ALJ indicated that she had considered the testimony of plaintiff's husband, but found that it was inconsistent with the weight of the record as a whole.  (Tr. 23).

Continuing to the fourth step in the evaluation process, the ALJ noted that Vocational Expert William Villa (VE) testified that with the residual functional capacity described above, the plaintiff could not perform her past relevant work as a special education teacher because such work generally exceeds the light exertional level. (Tr. 23-24). Therefore, at the fifth step of the evaluation, the ALJ determined, based on the VE's testimony, that an individual with the residual functional capacity described above would have been able to perform other work such as a classroom teacher, case aide, or food packager.  (Tr. 24).  The ALJ also indicated that the VE testified plaintiff would not have been able to perform any competitive work if she was absent more than two days a month, if she could not maintain the pace and persistence due to medication side effects, or if she needed rest periods or naps in excess of standard work breaks. (Tr. 24).   However, the ALJ determined that the record as a whole did not provide substantial support for these additional limitations, and therefore, she found that plaintiff was not entitled to a period of disability insurance benefits under the Act.  Id.

IV.     **THE RECORD**

A.      **Background**

Plaintiff Barbara Hanovich was 42 years old on the alleged onset of disability date of December 31, 1987.  (Tr. 28).  Her date last insured is March 31, 1996.  Id.  She is married and has two grown children.  (Tr. 300).  She has an undergraduate degree, with some graduate work in the field of education.  (Tr. 975).  She has work experience as a special education teacher.  (Tr. 975).  She did some part-time physician recruiting from her home for a number of years.  Id.  On a part-time basis, she also ran a travel agency and tour escort business from her home during her alleged period of disability.  Id.  She alleges disability from lupus, degenerative disc disease, ankylosing spondylitis, fatigue, vision loss, and Sjogren's[8] and Raynaud's[9] disorders.  (Tr. 29).

B.      **Medical Records Before Date Last Insured**

Plaintiff's alleged onset of disability date is December 31, 1987.  On July 20, 1983, plaintiff was seen by Dr. J. Douglas Cameron at the University of Minnesota Hospitals and Clinics, and was noted to have systemic lupus erythematosus and mild keratoconjunctivitis sicca.  (Tr. 747).  She was diagnosed with keratoconus of the right eye.  Id.

---

[8]     Sjogren's syndrome is an immunologic disorder characterized by deficient moisture production of glands, resulting in abnormal dryness of the mouth and eyes. MOSBY'S at 1498.

[9]     Raynaud's phenomenon is characterized by intermittent attacks of ischemia of the extremities of the body, usually accompanied by color changes, numbness, tingling, burning, and pain.  MOSBY'S at 1387.

On November 12, 1986, plaintiff was evaluated by Dr. Paul Waytz on referral by Dr. Mullin for a history of joint and back pain. (Tr. 614). Dr. Waytz noted that plaintiff had a very complex history, beginning with joint problems in high school, and periodic problems with joint and chest pain through college. (Tr. 614). She had significant back problems when she was pregnant with her first and second children. Id. She also had periodic GI problems over the years. Id.

Dr. Waytz noted that over the last few years, plaintiff had progressive problems with joint symptoms, and low and mid-back discomfort. (Tr. 614). She had been on multiple anti-inflammatories. Id. Dr. Waytz also noted that plaintiff had recurrent gastric and duodenal ulcers, as recently as a couple of weeks ago. Id. Plaintiff described having symptoms typical of Raynaud's and acrocyanosis[10] of her hands, dry eyes, and dry mouth. Id. Dr. Waytz further noted that plaintiff had a disturbed sleep pattern, and had been on at least one anti-depressant, which she did not tolerate very well. Id. Dr. Waytz also noted that plaintiff did a lot of work which involves travel. Id.

On examination, plaintiff was thin and a bit pale. (Tr. 613-14). Dr. Waytz did not detect any skin rashes but he saw some mottling[11] of the hands, arms, and legs. (Tr. 614). Plaintiff complained of multiple joint tenderness, and tenderness throughout the back. (Tr. 613). Dr. Waytz did not detect a lot of synovitis, or any effusions of the knees or ankles, and hip range of motion was normal. Id. Dr. Waytz noted that plaintiff

---

[10]   Acrocyanosis is a circulatory disorder in which the hands, and less commonly the feet, are persistently cold and blue; some forms are related to Raynaud phenomenon. STEDMAN'S at 17.

[11]   Mottling is an area of skin composed of macular lesions of varying shades or colors. STEDMAN'S at 1133.

had mild dorsal kyphosis,[12] and was tender throughout the back both on and off the muscle and bone.  (Tr. 613).  Dr. Waytz diagnosed arthralgias and questioned whether plaintiff would be a candidate for Plaquenil.[13]  Id.  Dr. Waytz ordered additional testing, and noted that he needed to talk to Drs. Mullin, Weinberg, and Warshawsky.  Id.

On August 6, 1987, plaintiff called Dr. David Weinberg's office at Digestive Disease Associates because she was suffering severe abdominal pain.  (Tr. 179). Plaintiff sought a prescription for Demerol, because Tylenol 3 was not helping. (Tr. 179).  She admitted that she had not been taking her medications on time or on a regular basis during a recent trip to Europe.  Id.  She had not been adhering to her diet or taking antacids.  Id.  Plaintiff was instructed to restart antacids.  Id.

Dr. Weinberg saw plaintiff for worsening symptoms of peptic disease on November 23, 1987.  (Tr. 199).  She was noted to be on multiple medications for arthralgias.  (Tr. 199).  Dr. Weinberg diagnosed chronic gastritis.  (Tr. 200).  He prescribed Misoprostol.  (Tr. 199).

On June 27, 1988, plaintiff was admitted to North Memorial Medical Center with peptic acid disease with associated nausea, vomiting and dehydration.  (Tr. 201). Dr. Weinberg stated, "the patient is well known to me to have chronic peptic disease and some form of collagen vascular disease."  Id.  He noted the many medications

---

[12]     Dorsal means pertaining to the back.  STEDMAN'S AT 537.  Kyphosis is:  1) an anteriorly concave curvature of the vertebral column; 2) a forward (flexion) curvature of the spine; the thoracic spine normally has a mild kyphosis; excessive forward curvature of the thoracic spine may represent a pathologic condition.  STEDMAN'S AT 955.

[13]     Plaquenil, used to treat malaria, is also useful in patients with systemic lupus erythematosus who have not responded satisfactorily to drugs with less potential for serious side effects.  http://www.rxlist.com/cgi/generic/hquine_ids.htm.

plaintiff was taking.  Id.  Dr. Weinberg's impression was:  "Antritis[14] with superficial erosions of a significant degree.  No well defined ulcers per se; that is, this patient has had evidence of active peptic disease, very likely drug induced." (Tr. 197).  Plaintiff was discharged on June 29, after rehydration.  (Tr. 201).

On January 4, 1989, plaintiff saw Dr. Waytz.  He noted she was off Prednisone and Plaquenil.  (Tr. 611).   Dr. Waytz reported that plaintiff apparently developed significant changes in densitometry.[15]  Id.  She also had early cataracts and some bilateral conus.  Id.  Despite her variety of problems, her GI tract was stable.  Id. Dr. Waytz also noted that plaintiff complained of arthralgia of the hands of feet, and upper back and neck pain.  (Tr. 611).  Plaintiff reported that her memory was worsening, and she had some episodes of exhaustion and confusion.  Id.

On examination, plaintiff's joints did not show active synovitis.  (Tr. 611).  There was some muscle spasm of the upper back and neck, but range of motion of her joints was good.  (Tr. 611).  Dr. Waytz noted that he would check an "LML-30" and lupus profile, and that he needed to speak with Dr. Mullin.  Id.

Plaintiff called Dr. Waytz in February 1989, because the medication Voltaren was not effective.  (Tr. 611).  Dr. Waytz prescribed Plaquenil, but then put plaintiff back on Voltaren the next month because her pain had increased.  Id.

---

[14]   Antritis is inflammation of an antrum.  MILLER-KEANE ENCYCLOPAEDIA & DICTIONARY OF MEDICINE, NURSING & ALLIED HEALTH at 132 (7th ed. 2003) ("Miller-Keane").  An antrum is a cavity or chamber.  Id.

[15]   Densitometry is a procedure utilizing a densitometer, which is an instrument used for measuring density of fluid, bacteria, protein fractions, or bones.  STEDMAN'S at 472-73.

Plaintiff underwent endoscopy by Dr. Weinberg on January 29, 1990, to evaluate the status of her peptic ulcer disease.  (Tr. 196).  She was found to have "active antral ulcer well defined and of significant size, very benign appearing consistent with nonsteroidal anti-inflammatory induced vs. straight peptic disease."  Id.  Plaintiff returned for evaluation eight weeks later, after discontinuing use of Prednisone and Naprosyn.  (Tr. 193, 580).  Examination showed the ulcer to be 75% healed.  (Tr. 192, 581).

On August 9, 1991, plaintiff underwent an upper endoscopy for evaluation of chronic peptic ulcer disease, which at times caused severe pain.   (Tr. 189).  Dr. Coleman Smith summarized plaintiff's situation as follows:

> This is a 45-year-old white female who has Lupus and is on numerous medications for this, including Aspirin.   She's known to have chronic peptic ulcer disease and has been demonstrated to have antral ulcers in the past, for a number of years.   She has been on Prilosec, every other day, and increasing this to daily has not helped the recurrence of her pain.   She finds that eating does relieve it to some extent, but at times the pain is so severe that she has been taking Demerol for this.   To rule-out the possibility of a recurrence of peptic disease, upper GI endoscopy was scheduled.

(Tr. 189).  Dr. Smith diagnosed antral ulcer.  (Tr. 190).

Dr. Weinberg saw plaintiff in follow-up on October 18, 1991.  (Tr. 152).  He noted that plaintiff has rheumatologic problems for which she sees Dr. Mullin, and takes medications including Naprosyn, Aspirin, Plaquenil, and Cardizem.  (Tr. 152).  Her other medications include Carafate, Prilosec, Cytotec, Prozac, Pericolace, and Macrodantin.  Id.  Dr. Weinberg noted that plaintiff has intermittent healing of her ulcer disease but it was recently active.  Id.  Plaintiff was improved but still symptomatic after three weeks of taking 40mg of Prilosec a day.  (Tr. 152).  Endoscopy showed diffuse antral gastritis

19

with no evidence of ulcer disease, and plaintiff was kept on Prilosec.   (Tr. 153).

Plaintiff had a total abdominal hysterectomy and bilateral salpingo-oophorectomy on June 12, 1992. (Tr. 572).  She was discharged on June 17, 1992.  (Tr. 571).

On November 4, 1992, plaintiff underwent another upper endoscopy by Dr. Weinberg, due to chronic use of Prilosec in high dose.  (Tr. 288).  Her esophagus, stomach, and duodenum were essentially normal.   (Tr. 289).   On the same day, a biopsy of plaintiff's stomach showed nondiagnostic benign gastric mucosa with no inflammation, atypia or ulceration.  (Tr. 290).

On September 2, 1994, plaintiff was referred by Dr. Mullin to Dr. Weinberg for evaluation of persistent dyspepsia[16] with increasing severity.   (Tr. 286).   An upper endoscopy indicated nonspecific esophagitis.  Id.  A gastric antral biopsy on the same day indicated superficial ulceration and erosion.   (Tr. 285).   Esophageal biopsies indicated "focal fungal and bacterial organisms."  Id.

On November 4, 1994, Dr. Mullin referred plaintiff to Dr. Weinberg for evaluation of iron deficiency anemia with a long history of abdominal pain and constipation. (Tr. 283).   A colonoscopy was performed, and the findings were consistent with melanosis coli[17] and internal hemorrhoids.   (Tr. 282-83).   The results of an upper abdominal ultrasound were normal.  (Tr. 559).  On November 14, 1994, plaintiff had a computed tomogram of the abdomen and pelvis, which was negative.  (Tr. 273, 556).

---

[16]     Dyspepsia is impaired gastric function due to some disorder of the stomach; characterized by epigastric pain, sometimes burning, nausea, and gaseous eructation. STEDMAN'S at 554.

[17]     Melanosis coli is abnormal dark pigmentation in the large intestine.  STEDMAN'S at 1083.

Plaintiff had surgery for varicose veins on both legs on October 30, 1995. (Tr. 549).

On March 13, 1996, plaintiff had an antral biopsy by Dr. Thomas R. Arlander, which showed antral gastritis with ulceration. (Tr. 281). Helicobacter[18] were not seen. Id. On April 9, 1996, mucosal biopsies of the right colon indicated melanosis coli. (Tr. 280). Terminal ileum and rectosigmoid biopsies were normal. Id. The biopsies did not explain the etiology of plaintiff's iron deficiency anemia. (Tr. 279). Dr. Weinberg suspected that the anemia resulted from chronic NSAID and Aspirin use. Id.

C.   **Medical Records After Date Last Insured[19]**

On April 23, 1996, plaintiff underwent an upper endoscopy by Dr. Weinberg to evaluate response to treatment for active peptic ulcer disease. (Tr. 275-76). Antral biopsies were taken of possible erosions. (Tr. 276). The esophagus was normal. Id. The gastric antrum biopsy showed ulcer, negative for Helicobacter pylori. (Tr. 274).

Plaintiff was referred by Dr. Mullin to Dr. David Kraker at Midwest Spine Institute on June 16, 1996, for evaluation of chronic back and neck pain. (Tr. 298). Her pain began six to eight weeks earlier. Id. Plaintiff noted that she had fractured her foot and was not walking correctly, and wondered if that contributed to her pain. (Tr. 298).

---

[18]   Helicobacter is bacteria sometimes associated with gastric and peptic ulcers. STEDMAN'S at 793.

[19]   The ALJ did not comment on many of the medical records after plaintiff's last date of insured. An ALJ should consider medical records after the date last insured to determine if they reflect a continuation of disability, corroboration of an earlier diagnosis, or are otherwise probative to whether the claimant suffered a disability for any continuous period prior to the expiration of her insured status. See Martonik v. Heckler, 773 F.2d 236, 240-41 (8th Cir. 1985) (finding ALJ erred in assuming he could not consider post-date-last-insured medical records of a claimant with lupus).

Aggravating factors of her pain were standing for a long time, and turning her head when reversing the car. (Tr. 299). A hot shower, heating pad, and massage helped relieve the pain. Id. She sometimes had difficulty sleeping. Id.

Plaintiff reported to Dr. Kraker that she owns a business called New Departures, and she worked four to five hours a week with no work restrictions. Id. Dr. Kraker noted that plaintiff has a long history of back pain, history of lupus, and history of possible early ankylosing spondylitis. (Tr. 301).

Upon examination, plaintiff had moderate thoracic kyphosis. (Tr. 301). She was tender at the cervical thoracic junction, the lower cervical spine, the left trapezius, and the mid- thoracic spine. Id. She had full cervical spine and shoulders range of motion. Id. Motor and sensory examination, and deep tendon reflexes were normal. Id. Range of motion and motor and sensory examination were also normal for her thoracic and lumbar spine, and lower extremities. (Tr. 302). X-rays indicated degenerative disc disease at C6-7, multi-level thoracic degenerative disc disease with moderate kyphosis, and severe degenerative disc disease at L4-5 and mild at L3-4. Id.

Dr. Kraker diagnosed degenerative disc disease, left low lumbar degenerative scoliosis[20], history of lupus, and history of possible ankylosing spondylitis. (Tr. 303). Dr. Kraker recommended a short dose of steroid "for her flare-up", a Medrol dosepak, physical therapy, and Vicodin "for this flare-up." Id. Plaintiff saw Dr. Kraker in follow-up on August 27, 1996. (Tr. 297). She was improving with physical therapy and the Medrol Dosepak. Id.

---

[20]    Scoliosis is abnormal lateral and rotational curvature of the vertebral column. STEDMAN'S at 1606.

On August 7, 1996, plaintiff had repair surgery by Dr. Jonathon Paley at North Memorial Medical Center for stress urinary incontinence, which had not responded to conservative treatment.  (Tr. 379-81, 384-86, 521-29).  Dr. Paley noted that plaintiff's medical history was most notable for systemic lupus erythematosus and some associated connective tissue disorders including Sjogren's syndrome and ankylosing spondylitis.  (Tr. 524).

After surgery, plaintiff was discharged on August 12.  (Tr. 379).  On August 18, plaintiff returned to the hospital with pelvic pain.  (Tr. 382).  Plaintiff had gone into urinary retention, and she was shown how to use a catheter.  Id.  On September 10, 1996, plaintiff was allowed to resume her usual activities and told to follow up by phone before travelling again.  (Tr. 353).

On August 5, 1997, plaintiff had an intraocular lens exchange of the left eye. (Tr. 327).

Plaintiff saw Dr. Kraker again on January 6, 1998.  (Tr. 295).  She was having an increase in back and right leg pain.  Id.  Dr. Kraker noted an MRI of December 19, 1997, showed multi-level disc degeneration, most advanced at L4-5 with foraminal stenosis due to a combination of lateral disc herniation, scoliosis, and degenerative changes in her facets.  (Tr. 295, 510-11).  On examination, plaintiff had slight decreased sensation in the right anterior thigh and mild weakness in the right quad.  (Tr. 295).  Dr. Kraker explained that her pain appeared to be due to the foraminal narrowing at the right L4-5. Id.  He recommended right L4 nerve root block.  Id.  He also recommended that she start on Daypro and physical therapy for her back and neck pain.  (Tr. 295-96).

On January 20, 1998, Dr. Kraker noted that plaintiff had six hours of relief, followed by a 40% improvement of her pain after the right nerve root block. (Tr. 294). However, her neck pain was increasing. Id. Dr. Kraker recommended that plaintiff have another nerve root block before considering discectomy and fusion. Id. He also recommended an MRI of the cervical spine. Id. The MRI showed disc herniation at C6-7 with mild foraminal stenosis; C5-6 osteophyte formation with disc protrusion and foraminal stenosis; and C4-5 mild spondylosis[21] and uncinate hypertrophy without neural foramina and similar changes at C3-4. (Tr. 657-58).

On February 17, 1998, Dr. Kraker noted that plaintiff had relief from the second nerve root block, with 50-60% improvement after three weeks. (Tr. 293). Dr. Kraker recommended another nerve root block in March 1998. (Tr. 293). The MRI of her cervical spine showed central disc bulging at C4-5, C5-6, and C6-7, without cord or nerve compression. Id. Dr. Kraker recommended continuing physical therapy. Id.

On March 31, 1998, Dr. Kraker noted that plaintiff had 40-50% relief from her third nerve root block. (Tr. 291). She had recently been on several trips where she was in quite a bit of pain. Id. She described her current pain as moderate. Id. Dr. Kraker recommended continued physical therapy and home cervical traction. (Tr. 291). He recommended that plaintiff try to live with the pain and to use Darvocet and Vistaril for relief, using Vicodin only for severe pain. Id.

In May 1998, plaintiff told Dr. Kraker that did not feel she could live with her neck and low back pain, and asked him about surgery. (Tr. 691). Dr. Kraker did not

---

[21]   Spondylosis is any lesion of the spine of degenerative nature. STEDMAN'S at 1678.

recommend surgery for her cervical spine, but he felt decompression, discectomy and fusion may be helpful for her lower back pain.  Id.  Plaintiff wanted to schedule her surgery after returning from a trip out of the country in the next few weeks.  (Tr. 692).  Dr. Kraker noted that plaintiff had a history of lupus and was on Relafen, Aspirin and Plaquenil, which she would not be able to stop in the post-operative period due to increased morning stiffness and pain.  (Tr. 691).  Dr. Kraker advised plaintiff that the use of anti-inflammatories may increase her risk that fusion of her lower spine would be unsuccessful.  Id.

On June 26, 1998, plaintiff underwent a preoperative history and examination, in preparation for decompression and fusion of her lumbar spine.  (Tr. 483).  Her medical history was significant for lupus, ankylosing spondylitis, chronic pain, peptic ulcer disease, Sjogren's syndrome, Raynaud's syndrome, corneal transplants in the right and left eyes, cataracts removed.  (Tr. 483).  In addition to low back pain with radiculopathy, she was found to have chronic neck pain associated with degenerative arthritis.  (Tr. 484).  She has thoracodorsal scoliosis.  (Tr. 485).

Plaintiff was asked about her social history.  She was noted to be married for 32 years to a cardiologist, and has two grown children.  (Tr. 484).  She has been a school teacher, and has a Master's Degree in Education.  Id.

Plaintiff underwent surgery for decompression and fusion on July 6, 1998.  (Tr. 304-08, 481-82, 492-95, 1024-26).  Post-operatively, she developed right leg and ankle pain, attributed to a flare-up of her lupus.  (Tr. 304).  She also had an episode of encephalopathy,[22] which was felt to be at least in part due to her medications.  (Tr. 304,

---

[22]     Encephalopathy is any disorder of the brain. STEDMAN'S at 588.

490).   She had an MRI of her thoracic spine on July 13, which indicated moderate thoracic kyphosis,[23] and moderate central disc protrusion at L2-3.  (Tr. 501-02).   Her pain improved with steroids and anti-inflammatories.  (Tr. 304).  Plaintiff was discharged on Oxycontin and Oxycodone.  Id.

On July 31, 1998, plaintiff saw Dr. Kraker and reported that she had not yet returned to work after surgery.  (Tr. 690).  She continued to have pain in the low back and right leg.  Id.  She was also recently experiencing fatigue and nosebleeds.  Id.  She was told to avoid driving for the next three to four weeks.  Id.

Plaintiff went to physical therapy from August 4, 1998 through November 24, 1998.  (Tr. 919-34).  By September, plaintiff was doing quite well and hoping to travel to Portugal in six weeks.   (Tr. 689).   Dr. Kraker noted that compared to many fusion patients, plaintiff was ahead of schedule.  Id.  Plaintiff reported that she wanted to go to Portugal in six weeks, but Dr. Kraker wanted to evaluate her status before she decided whether to go on the trip.  (Tr. 689).

When plaintiff saw Dr. Kraker in October 1998, she reported fatigue and loss of energy, especially if she was overactive or walked too much.  (Tr. 688).  Plaintiff also reported recently having a flare-up of her lupus.  Id.  Nevertheless, plaintiff planned to go to Australia in the next few weeks.  Id.  Dr. Kraker noted that plaintiff's fusion was consolidating well.  Id.  He recommended that plaintiff increase her walking on a daily basis.  Id.

---

[23]   Kyphosis is:  1) an anteriorly concave curvature of the vertebral column; 2) a forward (flexion) curvature of the spine; the thoracic spine normally has a mild kyphosis; excessive forward curvature of the thoracic spine may represent a pathologic condition. STEDMAN'S AT 955.

Plaintiff had a severe flare-up of back pain in November upon returning from a trip to Australia. (Tr. 687). Dr. Kraker felt the flare-up was due to the hardware from her surgery. Id. Plaintiff reported that she was scheduled to go to China as a tour guide the next week. Id. Dr. Kraker recommended that she fly first class so she could lie down and get up and walk around. Id.

In December of 1998, plaintiff underwent a neuropsychological evaluation by Dr. Steven Morgan at the Minneapolis Clinic of Neurology because she felt her memory was worsening over the last six months. (Tr. 975). She also described having severe headaches every two to three weeks for the last six to nine months. Id. Plaintiff was fully cooperative and well-motivated with neurocognitive testing. (Tr. 976). She demonstrated mild impairment in attention and concentration, fluid nonverbal reasoning, and visual and spatial construction skills. (Tr. 976). She demonstrated moderate impairment in nonverbal and visual memory. Id. Dr. Morgan opined that such a pattern suggests relative inefficiency of right cerebral functions. Id. He opined that her overall memory impairment was mild. (Tr. 977). He noted that plaintiff just led a tour group to China without major difficulties, suggesting that she was compensating adequately. (Tr. 977). However, he also noted that her MMPI suggests a personality style with a degree of denial or limited insight. Id.

Dr. Morgan indicated that given plaintiff's history of lupus, the possibility of related central nervous system involvement must be considered. (Tr. 976-77). Dr. Morgan also noted that the pattern of neurocognitive disorder plaintiff displayed is a pattern which can be seen with systemic lupus erythematosus. (Tr. 978).

27

On February 5, 1999, plaintiff saw Dr. Kraker.  (Tr. 685).  Plaintiff indicated that after a trip to Thailand where she was quite active, she was having an increase in pain. Id.  On examination, Dr. Kraker found that plaintiff had moderate spasm in the right side of the back.  Id.  Dr. Kraker believed the aggravation was due to overuse, and from the hardware in her back.  (Tr. 978).  He suggested that she could have the hardware removed one year after surgery, if her pain did not improve.  Id.  Plaintiff saw Dr. Kraker a short time later on February 19, 1999, at which time she reported that her back pain was worse after returning from a trip to New York.  (Tr. 684).  Dr. Kraker recommended cutting back her activities.  Id.  He also recommended pool and physical therapy.  Id.

Plaintiff had an MRI of her brain on February 16, 1999, because she was suffering memory loss.  (Tr. 473).  The MRI was normal.  Id.  Dr. Charles Horowitz at the Minneapolis Clinic of Neurology referred plaintiff to Dr. David Knopman at the University of Minnesota Department of Neurology.  (Tr. 973-74).

In the letter referring plaintiff to Dr. Knopman, Dr. Horowitz stated:

> Ms. Hanovich presents to you for evaluation of cognitive disturbance.  Neuropsychometric testing was performed on December 9, 1998, and did suggest a pattern of mild cognitive impairment, perhaps consistent with a history of systemic lupus erythematosus per Dr. Steven Morgan.  Of concern is Barbara's reported complaint of persistent and increasing memory disturbance.  She has been extremely active in her life, participating in many executive boards, as well as running her own travel agency, and participating in very frequent travel around the world.  In spite of the somewhat extreme circumstances she pushes herself to, she had definitely noted a change in her ability to remember and to think through problems.

(Tr. 973).  Dr. Horowitz noted that he also asked plaintiff to see Dr. Gerald Mullin, her rheumatologist, for general lupus reevaluation, since she had not seen him in the last year.  (Tr. 974).

On April 16, 1999, Dr. Kraker noted that plaintiff reported constant back pain, unless she was in the water.  (Tr. 683).  On examination, she had muscle spasm and mild weakness on the right side of the low back.  Id.  She was able to walk ten to thirteen minutes before having to stop.  Id.  She also had increased arm and neck pain and intermittent paresthesias in the hands.  Id.  Plaintiff had positive Tinel's sign at the wrist, so Dr. Kraker noted he would need to rule out carpal tunnel syndrome.  Id.  He also noted that plaintiff had known multi-level cervical degenerative disc disease with foraminal stenosis.  Id.  Dr. Kraker recommended EMGs done on both upper extremities.  Id.

On May 14, 1999, plaintiff saw Dr. Kraker and stated that she had developed more pain in the left leg.  (Tr. 681).  Dr. Kraker noted that she had bilateral spasm in the lumbar spine.  Id.  She was also noted to have a healed fracture of the right foot.  Id.  She was able to walk on the treadmill 25-40 minutes before having to stop with pain in the right leg.  Id.  Dr. Kraker recommended a CT scan of the lumbar spine.  Id.  Plaintiff had a CT scan of her lumbar spine on May 18, 1999, to rule out spinal stenosis. (Tr. 653).

Plaintiff returned to Dr. Kraker for evaluation on May 28, 1999, and reported increased weakness in the left arm, more weakness and discomfort in the right leg, and paresthesias in the hands and feet.  (Tr. 679).  Dr. Kraker reviewed the recent CT scan of her lumbar spine, and indicated that it showed a disc herniation at L2-3, which

29

Dr. Kraker felt to be the cause of her right leg discomfort.  Id.  He recommended hardware removal and a microdiscectomy at L2-3.  Id.  As to the weakness in her arms, an EMG had not shown any abnormalities.  Id.  Dr. Kraker recommended an MRI of the cervical spine.  Id.  The MRI did not show any significant changes since a scan on January 22, 1998.  (Tr. 677, 986).  Dr. Kraker noted that plaintiff would prefer to have surgery for hardware removal towards the end of June, because she planned to take a trip immediately before then.  (Tr. 680).

On June 10, 1999, plaintiff saw Dr. Horowitz for a follow-up.  (Tr. 969-70). Dr. Horowitz described plaintiff as having underlying lupus and progressive pain related to her lumbar spine.  (Tr. 969).  Dr. Horowitz also noted that plaintiff had neck pain, and her most recent evaluation was an MRI on June 8, 1999.  Id.  The MRI showed small C5-6 disc herniation, mildly compressing the C6 nerve root.  Id.  The MRI also showed advanced degenerative spondylosis at C6-7 with moderate bony foraminal stenosis. (Tr. 969).  This study showed no significant changes from a study of January 22, 1998. Id.  Dr. Horowitz stated that plaintiff's medications included Prevacid, Prozac, Indocin, occasional Tylenol with codeine, occasional Percocet, and Plaquenil.  (Tr. 969).  He noted "[p]laintiff has not had a true flare of lupus.  She has not required steroids in the recent past."  (Tr. 970).

Dr. Horowitz also noted that plaintiff continued to have problems with her memory, although an MRI scan of her brain was normal, and Dr. Knopman did not find her to have evidence of dementia.  (Tr. 970).  Dr. Horowitz was concerned that lupus may be causing her memory decline.  Id.  Given her continuing neck and back pain, and numbness and weakness in her hands, which might be related to lupus versus nerve

30

entrapment versus cervical spondylosis, Dr. Horowitz recommended that plaintiff reconsider her pending trip to Italy.  Id.

On examination by Dr. Kraker on June 11, 1999, plaintiff had marked tenderness of the left sciatic notch, the left iliac bone graft site, and SI joint.  (Tr. 677).  Dr. Kraker thought this was unusual, but could be related to lupus.  Id.  He recommended a CT scan of the pelvis to evaluate a potential occult lesion.  Id.

Plaintiff saw Dr. Ben Bache-Wiig as a new patient on June 14, 1999, for preoperative evaluation for back surgery scheduled for June 23, 1999.  (Tr. 1149). Dr. Bache-Wiig noted plaintiff's history of systemic lupus erythematosus, diagnosed at age twenty-five and treated by Dr. Mullin.  Id.  Dr. Bache-Wiig noted that plaintiff's lupus primarily manifested by serositis[24] and joint discomfort without severe deforming arthritis, with no renal involvement or central nervous system involvement.  (Tr. 1149). He also noted her history of peptic ulcer disease, bilateral corneal transplants, Sjogren's syndrome with sicca syndrome,[25] and chronic back and leg pain.  Id.

Dr. Bache-Wiig noted plaintiff fatigued easily, and has serositis with chest discomfort when her lupus flares.  (Tr. 1149).  Her energy was diminished, and she had chronic epigastric pain.  (Tr. 1149).  Because plaintiff had flare-ups of lupus with

---

[24]     Serositis is inflammation of a serous membrane.  STEDMAN'S at 1624.  Serous means relating to, containing, or producing serum or a substance having a watery consistency.  STEDMAN'S at 1624.

[25]     Sicca syndrome is a synonym for Sjogren's syndrome, which is characterized by dryness of the mucous membranes, and often associated with rheumatoid arthritis, Raynaud phenomenon, and dental caries, a localized, progressively destructive disease of the teeth.  STEDMAN'S AT 1767, 292.

previous surgery, Dr. Bache-Wiig gave her a Medrol dosepak before surgery, and noted he would give her a stress dose of steroids around the time of surgery.  (Tr. 1148).

On June 23, 1999, the day before plaintiff's surgery, Dr. Kraker noted that plaintiff just returned from a trip to Italy where she did a fair amount of walking, and she reported shaking in both legs when going up and down steps.  (Tr. 676).  Dr. Kraker noted that the CT scan of plaintiff's pelvis on June 14, 1999, was negative.  Id.  On examination, straight leg raise was positive on the left and right.  Id.  Dr. Kraker recommended hardware removal without discetomy because he felt some of her symptoms, which were not clear-cut and consistent, were due to lupus.  (Tr. 676).

On June 24, 1999, plaintiff underwent surgery for hardware removal.  (Tr. 309). Postoperatively, Dr. Kraker noted that plaintiff experienced significant pain, including pleuritic chest pain thought to be a flare-up of her lupus.  (Tr. 309).  She also experienced leg swelling and decreased sensation of her left lower extremity.  Id.  Her symptoms improved, and she was discharged on July 4, 1999.  Id.  Her post-operative diagnoses were solid posterior fusion, L4-5, and systemic lupus erythematosus flare-up. (Tr. 309).

On July 27, 1999, plaintiff saw Dr. Horowitz, who noted that she had become deconditioned overall.  (Tr. 967).  She was experiencing fatigue and weakness in her upper extremities.  (Tr. 967).  Nonetheless, she was gradually healing and improving. Id.  Dr. Horowitz recommended physical therapy and a Back to Fitness program.  Id.

On July 30, 1999, plaintiff saw Dr. Kraker and indicated that her back pain increased after she fell down some stairs while travelling in Quebec.  (Tr. 672).  Plaintiff also reported being fatigued and taking naps during the day.  (Tr. 672).  Dr. Kraker

agreed with Dr. Horowitz, who recommended that plaintiff continue with physical therapy.  Id.  She began a course of physical therapy on August 4, 1999.  (Tr. 906-11).  Dr. Kraker also noted that plaintiff was quite fatigued, and took frequent naps during the day.  (Tr. 672).  He opined that therapy should work on general conditioning.  Id.

On September 17, 1999, Dr. Kraker noted that plaintiff had been quite active, making several trips prior to her check-up.  (Tr. 671).  Plaintiff reported having increased pain in the right ankle, which was consistent with past lupus flares.  Id.  She was using a cane, as her right leg was weak and had given out on her.  Id.  She also noted upper extremity symptoms, such as inability to hold a toothbrush.  Id.  Dr. Kraker recommended continued pool therapy and beginning myofascial therapy.  Id.  He referred plaintiff to Dr. Horowitz for her upper extremity symptoms.  Id.

Plaintiff had fourteen sessions of physical therapy ending on October 6, 1999.  (Tr. 942-953).  Physical Therapist Anthony Yurick opined that plaintiff had plateaued in her progress and was independent in home exercise, but with questionable compliance due to her work and social calendar.  (Tr. 942).  Plaintiff returned for physical therapy on August 15, 2001 through October 25, 2001, (Tr. 940), November 8, 2001 through December 27, 2001, (Tr. 939), April 24, 2002 through October 22, 2002, (Tr. 937).

Plaintiff saw Dr. Cynthia Pederson on October 11, 1999, who noted plaintiff had a history of lupus.  (Tr. 1139).  Plaintiff complained of myalgias[26] and joint pain, and discomfort with taking deep breaths.  (Tr. 1139).  Plaintiff described her symptoms as consistent with previous lupus flares.  Id.  She was treated with Prednisone and

---

[26]     Myalgia is muscular pain.  STEDMAN'S at 1167.

Percocet.   (Tr. 1139).   A chest x-ray was obtained secondary to pleurisy, and was negative for signs of acute process.   Id.

Plaintiff saw Dr. Horowitz on October 12, 1999.  (Tr. 964).  He noted that she just had a flare of lupus, which was evaluated by Dr. Pederson.   Id.  Plaintiff reportedly was pleased with the results of her recent physical therapy.   (Tr. 964).   However, she continued to have neck pain, pain in her hips, swelling ankles, and increasing weakness in her right arm.   Id.  On examination, she had restricted range of motion in the cervical spine, with variable strength, and mild and diffuse weakness.   Id.  She also had slight weakness in the legs, with mildly suppressed reflexes throughout, and absent at the ankle.   Id.   Dr. Horowitz did not recommend surgery unless absolutely necessary. (Tr. 965).   He stated, "If [plaintiff] continues to progress in terms of neck symptomatology in spite of her treatment for lupus and in spite of physical therapy, then an MRI scan would be useful."   Id.   Plaintiff began a course of physical therapy on November 10, 1999, ending on March 6, 2000.  (Tr. 896-99).

On November 23, 1999, plaintiff went to the emergency room, and was admitted at North Memorial Health Care for increased back pain and abdominal pain.  (Tr. 434, 436-43, 1020-22).  On admission, she was noted to be "a 54-year-old white female with systemic lupus erythematosus."  (Tr. 1020).  She complained of feeling poorly for three weeks, with abdominal and back pain becoming much worse in the last four to five days.  (Tr. 1020).  Dr. Krieger noted that although her lupus usually responded to steroids, she recently did not have any improvement with steroids.   Id.  An endoscopy indicated distal antral ulcer with multiple punctuate antral ulcers.  (Tr. 443-44).  Plaintiff

was treated with Prevacid and antacids.   (Tr. 443).   She was discharged on November 26, 1999.  (Tr. 434).

Plaintiff saw Dr. Horowitz on December 10, 1999, after returning from trips to China, South America, and Orlando, Florida.  (Tr. 962).  On return, she had increasing symptoms of right-sided weakness.  Id.  Dr. Horowitz opined this may have been caused by a lupus flare over the last several weeks.  Id.  Plaintiff was also suffering visual disturbance and GI bleeding.  Id.  Dr. Horowitz recommended that plaintiff continue with pool therapy and moderate her activities.  (Tr. 963).  He noted that plaintiff would see Dr. Mullin the next week, and she hoped to have an injection in her right hip, which had helped her in the past.  Id.

On January 10, 2000, plaintiff saw Dr. Jerrold Stempl for an upper endoscopy to evaluate the healing of her ulcer.  (Tr. 450-51).  Dr. Stempl noted that plaintiff's history was:

> Significant for hysterectomy.  She's had gastric surgery, selective vagatomy, bladder surgery, corneal transplant, back surgery, cataract surgery.  She again has systemic lupus.

(Tr. 450).   The endoscopy showed decreased size and depth of the antral ulcer. (Tr. 451).

Plaintiff saw Dr. Kraker on January 14, 2000.  (Tr. 669).  She had increased back pain and leg pain after falling while traveling in the Himalayas.  Id.  She was having difficulty carrying things.  (Tr. 669).  She had tingling in her hands associated with Raynaud's phenomenon.  Id.  Dr. Kraker felt her arm symptoms may be a progression of her cervical disc degeneration.  (Tr. 669).  He noted that plaintiff had recently been hospitalized for a GI bleed and a lupus flare.  Id.  On examination, plaintiff had

diminished range of motion of the cervical spine.  Id.  Motor strength and grip strength were diminished.  Id.  She had moderate spasm on the right side of the lumbar spine, with positive straight leg raise.  Id.  Plaintiff had a lumbar epidural injection.  (Tr. 650).  She had 70% relief of her bilateral low back pain.  Id.

On January 25, 2000, plaintiff had an MRI of the cervical spine to rule out compression fracture.  (Tr. 648).  Compression fracture was ruled out, but the MRI showed multilevel degenerative disc disease of the cervical spine.  Id.  Plaintiff began physical therapy on February 2, 2000.  (Tr. 900-01, 894-97).

On January 26, 2000, Dr. Bache-Wiig described plaintiff's lupus as fairly stable, and her chronic pain as well-controlled by Oxycontin.  (Tr. 1133).  Plaintiff saw Dr. Bache-Wiig again in March, 2000, and stated that she was suffering from increased fatigue.  (Tr. 1132).  Dr. Bache-Wiig hoped to improve her arthritis control with Vioxx, while moving away from narcotic painkillers.  Id.  Plaintiff feared the Vioxx would not be sufficient for pain during her trip to Bolivia.  (Tr. 1129).  Dr. Bache-Wiig switched her to Relafen.  Id.

Plaintiff saw Dr. Horowitz for a follow-up on April 14, 2000.  (Tr. 960).  She had developed increasing stiffness and weakness in her hands.  Id.  She remained fatigued.  Id.  Examination showed evidence of atrophy in her hands.  (Tr. 961).  She had slight neuropathic changes in her hand and feet, and suppressed reflexes.  Id.  Dr. Horowitz recommended an EMG.  (Tr. 961).  The EMG did not show any definite abnormalities.  (Tr. 956-59).

On November 14, 2000, plaintiff saw Dr. Bache-Wiig for a preoperative examination for corneal transplant.  (Tr. 1123).  She was diagnosed with acute

bronchitis.  Id.  She also had a lesion on her wrist, which she first noticed when in China.  (Tr. 1122).  Biopsy of the lesion was strongly suggestive of infection.  (Tr. 1121). Dr. Bache-Wiig assessed plaintiff with systemic lupus erythematosus, acute bronchitis, peptic ulcer disease, stable, and chronic pain syndrome with difficult to control pain on high dose of narcotic therapy.  (Tr. 1123).  He recommended recheck before authorizing surgery.  Id.

On November 27, 2000, plaintiff again saw Dr. Bache-Wiig for preoperative examination for a corneal transplant scheduled for December 7, 2000.  (Tr. 1121). Dr. Bache-Wiig found plaintiff to be a suitable candidate for surgery.  Id.  He stated "[plaintiff] continues to travel fairly extensively and with travel often comes fatigue and flaring of her symptoms."  Id.

Plaintiff underwent a corneal transplant of the left eye on December 7, 2000. (Tr. 317).  After a previous corneal transplant and bilateral cataract extractions with implants, she developed bilateral iritis and a graft rejection in the left eye.  Id.  She was having trouble seeing and, thus, elected to have surgery.  (Tr. 317).  Before surgery, visual acuity in her right eye was 20/50 and 20/400 in the left eye.  Id.

On December 18, 2000, plaintiff's primary complaint was increased fatigue and difficulty controlling pain.  (Tr. 1119).  Dr. Bache-Wiig assessed plaintiff with "SLE [systemic lupus erythematosus] with chronic pain, now complaining of increased fatigue." (Tr. 1119).  Dr. Bache-Wiig noted that he would "check CBC, basic metabolic, and sed rate."  Id.  He recommended ongoing rheumatology evaluation with Dr. Hargrove, and recheck in one month.  Id.

Plaintiff saw Dr. Bache-Wiig on February 6, 2001, for follow-up of systemic lupus erythematosus and peptic ulcer disease. (Tr. 1115-16).   An upper endoscopy on February 15, 1999, showed a benign-appearing antral ulcer.  (Tr. 429).  Plaintiff was treated with Carafate and Prevacid.  Id.

On March 7, 2001, plaintiff saw Dr. Waytz to manage her rheumatologic issues, in light of Dr. Mullin's retirement.  (Tr. 608).  In a letter to Dr. Bache-Wiig, Dr. Waytz stated that plaintiff was having a lot of pain in the joints and skeleton, complicated by chronic ulcer disease.   Id.   She was also suffering from anemia[27], leukopenia[28], depression and osteoporosis.  Id.  On examination, Dr. Waytz found that plaintiff had scattered synovitis of the upper and lower extremities, only fair muscle development, and decreased mobility.  (Tr. 608).  Plaintiff's dose of Plaquenil was increased, and she was switched from Zoloft to Prozac.  Id.[29]

On May 11, 2001, plaintiff saw Dr. Bache-Wiig who noted that her chronic pain relates to her lupus, as well as degenerative arthritis in her spine.  (Tr. 1113).  He noted that plaintiff's pain was best treated with narcotic pain medication.   (Tr. 1113). Dr. Bache-Wiig changed plaintiff's medication for sleep from Ambien to Temazepam

---

[27]   Anemia is any condition in which the number of red blood cells are less than normal, and is frequently manifested by pallor of the skin and mucous membranes, shortness of breath, palpitations of the heart, soft systolic murmurs, lethargy and fatigability. STEDMAN'S at 73-74.

[28]   Leukopenia is any situation in which the total number of leukocytes in the circulating blood is less than normal. STEDMAN'S at 993.  Leukocytes are certain types of cells, which under various abnormal conditions, may be increased, decreased, altered, or present in different tissues and organs. STEDMAN'S at 990.

[29]   Plaintiff saw Dr. Waytz on April 25, 2001, August 15, 2001, and November 28, 2001.  (Tr. 605-07).  However, his notes are not legible.

due to inadequate control of her insomnia.  Id.  He noted that plaintiff continued to be very active in traveling, and her energy was fairly well maintained.  Id.

Plaintiff saw Dr. Horowitz on July 30, 2001, who described her as a 55-year-old woman with underlying lupus.  (Tr. 954).  Plaintiff complained of increasing neck and back pain.  He noted that her exacerbation of pain was following, but not necessarily related to riding a jet ski.  Id.  On examination, her neck range of motion was limited, and her motor strength was diminished.  Id.  She had mild weakness in the lower extremities, with difficulty rising on her heels and toes.  Id.  Dr. Horowitz also noted that her increase in myofascial pain could be caused by her degenerative spine disease.  (Tr. 955).  He recommended conservative treatment because there was no sign of radiculopathy.  Id.

On July 27, 2001, plaintiff saw Dr. Bache-Wiig for pain in the epigastrum and into the back.  (Tr. 1110).  In his report, Dr. Bache-Wiig stated, "Doubt this is all SLE[30], although it's always been difficult to pin down with her as she has very little objective finding beyond the pain symptoms she has."  (Tr. 1110).

On August 3, 2001, Dr. Kraker noted that plaintiff reported progressive pain in her back, which had caused her to recently cancel a trip to Europe.  (Tr. 666).  Dr. Kraker opined that most of her pain was due to disc degeneration at L3-4.  Id.  Dr. Kraker recommended Pilates or Yoga type exercises.  (Tr. 666).  He felt that extension of her fusion may be necessary, and ordered an MRI of her lumbar spine.  Id.

---

[30]   Given Dr. Bache-Wiig has described plaintiff as a 55-year-old female with systemic lupus erythematosus, presumably, that is what he meant by "SLE."

Dr. Kraker noted that he would see plaintiff after her trip to the East Coast the next week.  (Tr. 666).

Plaintiff had an MRI of her lumbar spine on August 15, 2001, due to increased lumbar pain.  (Tr. 646).  The MRI showed no recurrence of central or lateral stenosis at the postoperative level.  Id.  There was a new disc herniation at L3-4 with moderate right L4 nerve root compression.  (Tr. 647, 665).  Dr. Kraker recommended a repeat epidural, a distraction brace, and pool therapy.  (Tr. 665).  He recommended holding off surgery as long as possible because disc herniation can shrink naturally.  Id.

On August 24, 2001, Dr. Bache-Wiig noted that plaintiff has systemic lupus erythematosus and chronic back pain with a recent flare.  (Tr. 1109).  He found it difficult to know how much of plaintiff's pain was from degenerative wear and tear in her spine versus significant inflammatory arthritis.  Id.  He advised plaintiff to seek a second opinion from a rheumatologist at Mayo Clinic, because she had not received a very satisfactory response from the rheumatologist she was seeing.  Id.

In January 2002, plaintiff saw Dr. Bache-Wiig and reported that she had a recent increase in back pain with some muscle spasm.  (Tr. 1102).  On examination, there was not a significant increase in radicular portions of her back pain.  (Tr. 1102).  Dr. Bache-Wiig diagnosed "SLE/chronic pain/PUD."  Id.  Plaintiff was referred for physical therapy. Id.

On March 6, 2002, plaintiff was hospitalized with a severe increase in right leg pain.  (Tr. 392-399, 1018-19, 1092).  She was described as a 56-year-old female with a long history of chronic back pain felt secondary to a combination of systemic lupus and degenerative disc disease.  (Tr. 1018).  Plaintiff appeared in moderate acute distress.

40

Id.  An MRI showed a large L3-4 disc herniation with nerve root impingement, increased in size from her last scan.  (Tr. 397).  She had some pain relief from an epidural steroid injection on March 6, and continued on oral pain medications.  (Tr. 402, 392).  She was discharged on March 13, 2002, with the diagnoses of lumbar degenerative disc disease with intractable back pain; systemic lupus erythematosus; peptic ulcer disease; Sjogren's syndrome; pleuritic chest pain; and anemia of chronic disease.  (Tr. 392).

On March 28, 2002, plaintiff was evaluated by Nurse Deborah Hauser at North Memorial Health Care prior to lumbar spine surgery scheduled for the next week. (Tr. 425).  Nurse Hauser noted plaintiff to have a history of ankylosing spondylosis and lupus.  Id.  Plaintiff told Nurse Hauser that Dr. Kraker wanted her to be involved in plaintiff's pain management after the surgery.  Id.  Plaintiff was hoping her pain would be at a tolerable level so she could take a planned trip to China at the end of June.  Her recent increase in pain had caused her to cancel a long-awaited family vacation.  Id.

Plaintiff was admitted to North Memorial Health Care for lumbar surgery on April 1, 2002, with low back pain and radicular symptoms.  (Tr. 330, 413-15).  Dr. James Anderson noted plaintiff's history of lupus, GI bleeds, Sjogren syndrome, osteopenia, and ankylosing spondylitis.  (Tr. 413).  Plaintiff reported some visual problems related to her lupus and keratoconus and dry eyes.  (Tr. 414).  She reported having feelings, approximately every three months, of being overwhelmed by pain and responsibilities. Id.  On those occasions, she used Valium for relaxation.  Id.

After plaintiff's surgery for lateral stenosis and chronic right L3-4 disc herniation, she experienced a flare of her lupus during her hospital stay.  (Tr. 333, 411, 416-17). She also developed a post-operative anemia and was given a blood transfusion.

41

(Tr. 411).  She was discharged on April 7, 2002.  (Tr. 333, 411).  In follow-up in April, plaintiff was doing well overall, with improvement in her leg pain.  (Tr. 664, 1091). Dr. Kraker noted that although he recommended weaning plaintiff from Oxycontin, she may need a low dose to control her lupus flares, especially for her chest pain.  (Tr. 664). On May 15, 2002, Dr. Kraker noted that plaintiff had anemia, which was probably anemia of chronic disease.  (Tr. 1090).

On July 10, 2002, plaintiff was seen by Dr. Waytz for a follow-up of systemic lupus, ankylosing spondylitis, degenerative back disease, and other issues.  (Tr. 603). Dr. Waytz noted that she had lumbar surgery in early April which had gone fairly well, and that she was experiencing her usual ups and downs with joint symptoms, without any major flare-ups.  Id.  Plaintiff reported trying to remain busy and active, having recently returned from China and planning a trip to Thailand for November.  Id. Dr. Waytz found minimal synovitis in several PIP and MCP joints bilaterally, and questionable thickening of the wrist.  (Tr. 603).  He stated that the findings were minimal, and that he found no active synovitis.  Id.  Dr. Waytz's assessment was that plaintiff's systemic lupus and her ankylosing spondylitis were relatively stable, and that she had degenerative disc disease, reflux and corneal problems.  (Tr. 603).

On July 23, 2002, plaintiff had a corneal transplant of the left eye with removal of two papillomas of the right upper lid, performed by Dr. Robert S. Warshawsky.  (Tr. 321-22).  Dr. Warshawsky noted plaintiff to have keratoconjunctivitis with significant surface drying of the eyes.  (Tr. 321).

On August 2, 2002, plaintiff saw Dr. Kraker for a flare of mid-back pain about two weeks ago.  (Tr. 663).  This occurred after a trip to China, and spending time at her lake

42

cabin, where she was able to do some kayaking.  Id.  Dr. Kraker noted that plaintiff had scoliosis and probably some mild instability.  (Tr. 663).  He opined that plaintiff's recent flare was probably from overuse.  Id.  He felt her flare-up would gradually improve with continued exercise and pool therapy.  Id.  Dr. Kraker noted that plaintiff reported a history of osteoporosis, based on a bone density scan, but Dr. Kraker did not have a report of this.  Id.  Nevertheless, he believed plaintiff to be at risk for compression fracture, and he recommended Actonel.  Id.

On August 7, 2002, plaintiff was evaluated by Dr. Tim Larson in consultation with Dr. Bache-Wiig for longstanding leukopenia and anemia.  (Tr. 700).  By history, plaintiff was diagnosed with systemic lupus erythematosus at age twenty-five, after developing fatigue and malaise in her college years.  Id.  She had an active course of disease with arthritis and pericarditis.  Id.  Most joints of her body have been affected.  Id.  She also developed Sjogren's syndrome.  Id.  However, she had remained active.  Id.

Dr. Larson noted that plaintiff ran a travel escort and consultation service and travelled frequently to Europe and Asia.  (Tr. 701). In his review of systems, Dr. Larson stated that plaintiff had chronic pain in the back and joints, some peripheral neuropathy, and that she complained of weakness in her extremities.  (Tr. 700).  Plaintiff also reported increased fatigue, presumably related to anemia.  Id.  She also had mild leukopenia.  Id.  Plaintiff's medications included Prozac, Prevacid, Oxycontin, Septra, Premarin, Plaquenil, Arava, Temazepam, Neurontin, Vioxx, Oxycodone, Valium, and Vicodin.  (Tr. 700).

Dr. Larson stated that the cause of plaintiff's anemia and leukopenia was not determined, although it is a frequent finding in patients with lupus.  (Tr. 701).  He further

stated, "Obviously, her history of prior miscarriage as well as two post-obstetrical deep venous thrombosis is somewhat concerning in a patient with lupus.  Antiphospholipid[31] syndrome is commonly seen in this patient population.  (Tr. 701-02).  He recommended additional testing.  (Tr. 702).

On October 23, 2002, plaintiff saw Dr. Bache-Wiig.  He noted that plaintiff's lupus, chronic back pain, and anemia had all improved somewhat by this date. (Tr. 1087).

On November 1, 2002, plaintiff was seen by Dr. Waytz for follow-up of systemic lupus and ankylosing spondylitis.  (Tr. 601).  At the time of the appointment, plaintiff complained of significant abdominal and chest pain, including nausea and vomiting.  Id. The general examination of plaintiff was essentially normal.  Id.  On the joint exam, Dr. Waytz found minimal synovitis in the PIP and MCP joints bilaterally, no synovitis of the wrists, and questionable thickening of the ankles.  Id.  Dr. Waytz expressed concern for the possibility of ulcer disease or pancreatitis.  Id.

On November 26, 2002, plaintiff was seen by Dr. Larson for anemia and leukopenia related to underlying systemic lupus erythematosus.  (Tr. 706).  Dr. Larson noted that plaintiff had recently returned from a visit to Thailand.  Id.  She had some symptoms suggesting a flare of lupus including chest discomfort, morning stiffness, and weakness in her grip bilaterally.  (Tr. 706).  Dr. Larson's diagnosis included anemia related to underlying inflammation from lupus.  (Tr. 707).

---

[31]     A phospholipid is any lipid that contains phosphorous.  They are the major lipids in cell membranes.  MILLER-KEANE at 1361.

On April 18, 2003**,** plaintiff saw Dr, Kraker, which was one year after lumbar surgery.  At this time she indicated that she was experiencing progressive back and leg discomfort.  (Tr. 662).  She also had neck discomfort, diminished grip strength, and problems with balance.  (Tr. 662).  On examination, she had limited range of motion, positive straight leg raise on the right, and mild weakness bilaterally.  Id.  She was referred for MRIs and X-rays.  Id.

An MRI of plaintiff's cervical spine on April 22, 2003, indicated diffuse cervical and upper thoracic spondylosis, with marked degenerative changes at C6-7, moderate at C5-6, with bulging and osteophyte at each of these levels, mild narrowing of the central canal, and no cord impingement.  (Tr. 644, 661).  Multilevel foraminal stenosis was moderate at C6-7 and severe at C5-6.  Id.  An MRI of the lumbar spine on the same day indicated mild to moderate multilevel lower thoracic and lumbar disc degeneration, and solid fusion at L4-5, with a mild generalized thoracolumbar scoliosis.  (Tr. 642, 661).  There was advanced disc degeneration at L3-4 and L2-3 with bulging and osteophyte at each level.  Id.  There was chronic multilevel foraminal stenosis with mild right L3 nerve root impingement.

On May 9, 2003, Dr. Kraker opined that there had been progression of degeneration in plaintiff's cervical and lumber spine since the last MRI scans.  (Tr. 661).  He recommended trying to live with the pain with conservative treatment.  Id.  He felt plaintiff may need a handicapped sticker and more help with the housework.  Id.

On August 25, 2003, Dr. Charles Grant, a State Agency Medical Consultant was asked to assess plaintiff's claims of "DDD[32], SLE, ankylosing spondylitis, fatigue, vision

---

[32]     The Court believes "DDD" stands for "degenerative disc disease."  (Tr. 1164).

loss, Sjogren's & Raynaud's."  (Tr. 1011).   In the response to the request, Dr. Grant checked the box referencing the SSA form for physical impairments (RFC); he did not check the boxes that indicated that plaintiff's severe impairments met or equaled the impairments listed in the regulations.  Id.  After noting the "Primary Diagnosis" of Keratoconus, the "Secondary Diagnosis" of Acid Peptic Disease, and the "Other Alleged Impairment" of SLE/Raynaud's, Dr. Grant then proceeded to evaluate plaintiff's residual functional capacity.  (Tr. 1003-1010).

Dr. Grant opined that plaintiff had the residual functional capacity to lift twenty pounds occasionally, ten pounds frequently; can stand or walk six hours in an eight hour workday; can sit six hours in an eight hour workday; and has an unlimited ability to push and pull and operate hand or foot pedals.  (Tr. 1004).  In support of these limitations, Dr. Grant noted that plaintiff suffered from Keratoconus, PUD (peptic ulcer disease), SLE (systemic lupus erythematosus) and Raynaud's, and surgery for urinary stress incontinence.   With respect to the systemic lupus erythematosus and Raynaud's, Dr. Grant stated that these conditions were "stable, but symptomatic treatment sometimes complicated by ulcer disease which contraindicated certain meds." (Tr. 1005).   State Agency physician, Dr. Dan Larson, affirmed Dr. Grant's opinion. (Tr. 1010).

On October 31, 2003, plaintiff saw Dr. Bache-Wiig who noted that he had been trying to taper plaintiff's pain medications as she had significant side effects.  (Tr. 1079). Earlier that month, she complained of memory loss.  (Tr. 1078).   Dr. Bache-Wiig assessed plaintiff with chronic pain, systemic lupus erythematosus, and peptic ulcer disease, all stable.  (Tr. 1079).  Dr. Bache-Wiig thought plaintiff may have to try inpatient

detoxification to find out "how much of her current symptoms relate to issues with possible narcotic dependence, as well as her chronic pain." Id. In December, Dr. Bache-Wiig noted that plaintiff went on a nine-day trip to Thailand, which she tolerated well. (Tr. 1077). Dr. Bache-Wiig noted that plaintiff was taking Oxycontin and Oxycodone for pain, Temazepam for sleep, Vioxx for her back, and Plaquenil and Arava for her lupus. (Tr. 1077).

Plaintiff had rectal prolapse repair surgery, and in February 2004, she was seen by Dr. Bache-Wiig for post-hospital follow-up. (Tr. 1056). While hospitalized, she had an acute lung injury. Id. She was doing well postoperatively. (Tr. 1054, 1056). Dr. Bache-Wiig assessed plaintiff with systemic lupus erythematosus with chronic pain, stable, and gastroesophageal reflux disease, stable. (Tr. 1054).

On April 7, 2004, plaintiff saw Dr. Kraker because she had foot pain, ankle swelling, and fatigue. (Tr. 1053). She was otherwise doing fairly well. Id. She did not currently have clear evidence of disease activity of her systemic lupus erythematosus. (Tr. 1053).

On May 26, 2004, she saw Dr. Cindy Weisz, who noted that plaintiff had a known history of "SLE and lupus." Plaintiff's only complaint was that her reflux was acting up. Id. Plaintiff reported that she was preparing for a trip to Asia the next day. (Tr. 1052).

Plaintiff was hospitalized June 12-16, 2004, with profound dehydration secondary to nausea and vomiting, and back and chest pain. (Tr. 1013-17). Dr. Brian Dixon noted that the latter symptoms were typical of her lupus flares. (Tr. 1013). Plaintiff indicated that she began to feel malaise on a plane trip from Bangkok to Tokyo. (Tr. 1013). Her

condition worsened on the flight from Tokyo to Minneapolis.  Id.  She was unable to keep down her pain medications for 24 hours.  Id.

In the section of his report entitled "Past Medical History", Dr. Dixon noted thirteen different medical conditions, including systemic lupus erythematosus, ankylosing spondylitis, and chronic pain secondary to the systemic lupus erythematosus and ankylosing spondylitis.  (Tr. 1013).  In the section entitled "Medications", Dr. Dixon listed the twelve different medications that plaintiff used.  (Tr. 1014).

Dr. Dixon assessed plaintiff with "a history of lupus and chronic pain requiring scheduled long acting narcotic doses.  (Tr. 1014).  Dr. Dixon believed her symptoms could be from infection, or from opiate withdrawal, given the amount of time she was without Oxycontin.  (Tr. 1015).

On June 18, 2004, plaintiff was noted by Dr. Dixon to have had an episode of transient acute confusional state, brought on by her recent illness and profound exhaustion.  (Tr. 1049).  This resolved after fifteen hours of sleep the next day.  Id. Dr. Dixon assessed plaintiff with transient acute confusional state, apparently related to profound exhaustion; partial small bowel obstructions with dehydration, resolved; SLE with chronic pain, currently at baseline; and anemia of chronic disease.  Id.

On July 14, 2004, Dr. Cynthia Weisz noted that plaintiff was recovering from dehydration and partial small bowel obstruction.  (Tr. 1031).  Plaintiff was feeling fatigued, and had an exacerbation of Raynaud's phenomenon.  (Tr. 1046).  Dr. Weisz recommended therapy at the Courage Center to "reinstitute her energy levels with her known history of SLE and fatigue with myalgias."  Id.

48

Plaintiff saw Dr. Bache-Wiig on October 13, 2004. (Tr. 1030, 1041). He described her as a chronically-ill appearing, middle-aged female, weighing 97 pounds. Id. Dr. Bache-Wiig assessed plaintiff with systemic lupus erythematosus, chronic back pain, and a history of peptic ulcer disease, which were all stable. Id. He stated that "[p]ain control remains a major issue for this patient." Id.

On October 29, 2004, plaintiff was seen by Dr. Bache-Wiig for a flare of lupus with serositis with evidence of acute inflammation. (Tr. 1029, 1039). She was given a Medrol dosepak and Prednisone. Id.

On November 19, 2004, plaintiff was seen by Dr. Bache-Wiig who noted her recent flare of lupus causing serositis. (Tr. 1028). Plaintiff reported that her pain was improving but her fatigue increased. Id. On January 19, 2005, plaintiff was noted by Dr. Bache-Wiig to be scheduled for surgery to address chronic and progressive foot pain. (Tr. 1027, 1037).

Physical Therapist Debra Cornick sent a letter by facsimile on March 15, 2005 to "To Whom it May Concern" concerning plaintiff's functional restrictions. (Tr. 1012). She stated that plaintiff began physical therapy with her in August 2001, and continued until June 2002. Id. By June 2002, Ms. Cornick noted that plaintiff had made progress to walking thirty to forty minutes, but she remained limited in static positions, had difficulty sleeping, and continued to display dysfunction in trunk stability, with increasing thoracic kyphosis. (Tr. 1012). Ms. Cornick also indicated that she continued to see plaintiff in her home one to two times a week for exercise when plaintiff's health allowed. Id. Ms. Cornick noted that plaintiff had other medical issues, including declining vision, and lupus, which required continuous monitoring, and declining vision. Id.

49

Ms. Cornick noted that plaintiff's health fluctuated over the time she worked with her, but plaintiff never fully recovered from lumbar surgery, which was aggravated by her osteoporosis and chronic medical issues.   (Tr. 1012).   Ms. Cornick described plaintiff's limitations as limited functional mobility in sitting and standing, and difficulty sleeping.   (Tr. 1012).   Plaintiff's tolerance to walking varies, but she must rest frequently.  Id.  Transportation was difficult for plaintiff, due to her vision.  Id.   Although plaintiff worked diligently to maintain functioning, Ms. Cornick opined that it was impossible for her to be employed.  Id.

On May 6, 2005, Dr. Waytz, plaintiff's rheumatologist, completed a questionnaire from plaintiff's attorney.   (Tr. 1151).   Dr. Waytz indicated that he first saw plaintiff in Novmeber 1986, and her diagnosed impairments include systemic lupus, ankylosing spondylitis, and osteoporosis.  Id.  He indicated that these impairments were supported by plaintiff's "history, physical exams, lab tests, and xrays", and that her symptoms of joint pain, stiffness, weakness, decreased mobility and fatigue all resulted from these impairments.  Id.  Dr. Waytz further indicated that the severity and duration of plaintiff's symptoms were reasonably consistent with the clinical and diagnostic findings.  Id.   In the cover memorandum from plaintiff's attorney to the ALJ attaching Dr. Waytz's response to the Questionnaire, counsel indicated that Dr. Waytz had stated in response to Questions 6 and 9 that plaintiff was unable "to perform simple, unskilled, low-stress sedentary work on a full-time, sustained basis since 3/31/96."  (Tr. 1150).[33]

---

[33]    The second page of the Questionnaire, where presumably Dr. Waytz made this statement, was blank.  (Tr. 1152).  However, for the purpose of this decision, the Court will assume, as has the ALJ (Tr. 21) and defendant, that Dr. Waytz did make this statement.  See Def. Mem., p. 12.

Dr. Mullin, plaintiff's rheumatologist from 1975 until December 12, 2000, also completed a questionnaire from plaintiff's attorney on July 12, 2005.  (Tr. 1153-55). Dr. Mullin indicated that he treated plaintiff for "lupus like disease, arthralgias, back and neck pain, osteoporosis (treated) Raynaud's phenomenon, postural hypotension, corneal dystrophy, Sjogren's [syndrome], chest wall pain, and fibromyalgia (secondary)."  (Tr. 1154).  He indicated that he used the following clinical and diagnostic techniques to establish these impairments: multiple exams, lab tests for many abnormalities, multiple x-rays and scans, multiple subspecialty exams or referrals, and multiple upper and lower gastrointestinal endoscopies.  Id.  Dr. Mullin stated plaintiff's symptoms from these impairments were chronic pain in her back and extremities, fatigue, cold extremities, confused thinking, multiple instances of anemia, and GI bleeding.  Id.  In response to Question 6, he indicated that the severity and duration of her symptoms were reasonably related to clinical and diagnostic findings.  Id.

In response to Question 7, which asked him whether, given her symptoms as of December 31, 1995, she would be unable to perform simple, unskilled, low-stress, sedentary work, eight hours per day, five days per week on a sustained basis with only normal rest periods, Dr. Mullin responded "no", stating that "she was not interested in doing simple, unskilled, low stress, sedentary work."  (Tr. 1155).  He answered "yes" to Question Eight regarding whether she would she have had three or more unscheduled absences per month if she had attempted such work, noting "unpredictable work history."  Id.  In response to Question 9, Dr. Mullin indicated that if plaintiff attempted such work, she would likely require more opportunity to rest than two fifteen minute breaks, a forty-five minute meal, and five non-consecutive minutes per hour.  Id.  He

also stated that his responses to Questions 6 through 9 applied since March 31, 1996. (Tr. 1155).

Question 11 asked:

> Do you routinely include a specific opinion about the patient's ability to perform simple, unskilled, low-stress, sedentary work eight hours per day, five days per week on a sustained basis in the patient's chart or only furnish such an opinion if requested?

(Tr. 1155).  Dr. Mullin stated: "Work history included in chart.  I could not predict when she could work and when she couldn't."  Id.  Below Dr. Mullin's signature he wrote, "I would discuss this complicated case with you if you wish."  Id.

### D.   Hearing Before The Administrative Law Judge

At the hearing, plaintiff's counsel explained that they had been unable to obtain the medical records from Dr. Mullin, plaintiff's treating rheumatologist, who retired in 2000.  (Tr. 1162-63).

Plaintiff testified regarding her situation in support of her claim that she has been unable to work full-time since 1987.  (Tr. 1166).  Plaintiff indicated she has had many hospitalizations.  Id.  As a tutor and substitute teacher in the 1980's, she was often unavailable to work because she was non-functioning.  Id.  Her symptoms were crushing chest pain, and swelling in hands to the extent that they were not useable. (Tr. 1166-67).  She would take pain medications to control the pain, but then her cognitive skills and orientation became more impaired over the years.  (Tr. 1167). Plaintiff stated she could drive very little because Sjogren's and cornea transplants affect her eyes, and when she has driven, she often has had to call someone because

she was disoriented.  (Tr. 1168).  Plaintiff still has difficulty with her vision and reads only large print or has her husband read to her.  Id.

In the 1980s and 1990s, plaintiff had a live-in housekeeper.  (Tr. 1170).  She tried to do volunteer work on a national board, but quit when she could no longer travel alone and she could not understand the financial statements of her committee.  Id.  Plaintiff stated that her husband has taken over the financial responsibilities at home, along with the cooking and shopping.  Id.

Plaintiff indicated that she has traveled extensively, including trips to Bangkok, Antarctica, Buenos Aires, Italy, England, and numerous cruises, but she only travels with her husband.  (Tr. 1171-72, 1177).  For three years in a row she has had to cancel an annual trip to Mexico with her family because she was too ill to go.  (Tr. 1172).  When they travel, plaintiff and her husband leave a day before any scheduled events so she can rest for a full day.  (Tr. 1177).

Plaintiff testified that she had gastric ulcers caused by her medications.  Id.  Chronic pain medication helps her but makes her confused.  (Tr. 1173).  Plaintiff stated that she has had neurological changes from the lupus or the medication.  Id.

Plaintiff used to ice-skate and roller-skate for hobbies; she stated she was a professional ice-skater.  (Tr. 1173).  Now she cannot skate because she has fallen and blacked out.  Id.

Plaintiff enjoyed reading and gardening, but now she can not be out in the sun.  (Tr. 1174).  Plaintiff tried working at Dayton's three to four hours a day in the demonstration department, but she was fired because she could not carry things to the

table.  (Tr. 1174).  Plaintiff gave up playing bridge and solitaire because she could not concentrate.  (Tr. 1175).

Plaintiff testified that she did not believe she could have performed a simple, seated job on a five-day a week basis before 1996 because she could not sit for that length of time, and she was not reliable as to when she would have a good or bad day. (Tr. 1176-77).  She testified that in the early 1990s, she was nonfunctional 30 to 50% of the time and that it was totally unpredictable.  (Tr. 1177).

Plaintiff stated she was first diagnosed with lupus approximately thirty-five years ago.  (Tr. 1178).  She testified that, other than fatigue, the most identifiable symptoms from lupus were ankylosing spondylitis, the joint pain involvement, and pleuritic chest pain.  (Tr. 1178).

In response to questions from the VE, plaintiff stated that from 1990 through 1994, she did physician recruiting from home about two hours a day, with the help of an assistant who did some of the phone calling and interviewing. (Tr. 1179).  In the past, she worked as a special education teacher.  Id.  Plaintiff also stated that while she owned a travel agency, she does not work at it or go to the office.  (Tr. 1192).  The last time plaintiff did any work in the travel agency was in January 2005, when she took a group to Thailand with her husband.  Id.

Plaintiff's husband, Dr. Hanovich, testified that plaintiff has served on a national board involved in starting a new synagogue, which involved going to meetings twice a year.  (Tr. 1182).  She also volunteered at the Guthrie Theater.  (Tr. 1182).  Many years ago, she was involved with the putting on events for the American Heart Association. Id.  Dr. Hanovich confirmed that he and plaintiff have travelled extensively.  (Tr. 1183).

Dr. Hanovich stated that plaintiff's condition has changed since 1987 because her fatigue is more prominent, possibly related to suffering from anemia, and she has to sleep a lot.  (Tr. 1183-84).  He said they like to go on cruises because she can get a lot of rest.  (Tr. 1184).  He testified that she has been in chronic pain from lupus.  Id.  The chest pain prevents her from doing anything, and in the last ten years, with the degeneration of her back, she been pretty much in chronic pain.  (Tr. 1184).  Her back pain has caused plaintiff be unable to lift, and for that reason, he has shopped with her for years.  (Tr. 1185).

Dr. Hanovich indicated that they have to limit what they do when they are travelling because of plaintiff's fatigue.  (Tr. 1186).  He handles the baggage.  Id.  When they arrive at a destination, they try not to do anything the first day so that plaintiff can recover, and then they try not to have long days.  Id.

Dr. Hanovich does not believe his wife could have done even a simple sedentary job because she was too fatigued, and she could not sit for long periods of time due to her back pain.  (Tr. 1187).  Dr. Hanovich stated that plaintiff would be fine for a few days, and then she would "hit the wall" and be in a lot of pain and unable to function.  Id.  Plaintiff would take more pain medication, which would then make it more difficult for her to function.  Id.  The flares of pain last from a day up to a week.  Id.  In terms of needing to rest, Dr. Hanovich stated that plaintiff got up late and then needed a nap in the afternoon.  (Tr. 1188).  Plaintiff could not function without a nap.  Id.

Anita Beesack, a friend, also testified on plaintiff's behalf.  (Tr. 1189).  She lived with plaintiff for a year in 1980, helping her at home and with the children when plaintiff was bedridden much of the time.  Id.  During this period, Beesack cooked, cleaned,

shopped, took plaintiff's children to and from school and their after-school activities, as plaintiff was not able to do much at that time and was in and out of the hospital. (Tr. 1189).  Beesack has stayed in touch with plaintiff since then.  Id.  She testified that plaintiff could not have done an entry level clerical job where she could sit and stand at her leisure because, while plaintiff might feel great for a period of time, then "she hits the wall" and has to sit or lay down and take her pain medication.  (Tr. 1190).  According to Beesack, although plaintiff has good periods, they do not last a whole day.  Id.

Vocational expert William Villa, testified at the hearing.  (Tr. 1190).  He noted that plaintiff's past relevant work was teaching special education.  (Tr. 1191).  The ALJ posed the following hypothetical question to the VE:

> Assume we have an individual who at - - protective filing would've been. . . 48 years of age.  She had a college education, work experience as outlined by yourself, who was on a number of medications.  The only apparent side effects being some ulcers and digestive tract problems.  Who had the prior relevant work experience as you've defined.  Who was impaired with lupus, degenerative disc disease, spondylitis, who suffered chronic pain.  Who had subsequent to the DLI three back surgeries.  Who is status post-corneal transplant.  Who suffered from [Sjogren's disease and Raynaud's syndrome].  Who would've been limited to lifting and carrying twenty pounds occasionally, ten pounds frequently.  Who could've done work where there would be no requirement for constant visual acuity.  And by that, I mean staring into a microscope or staring at a computer screen all day.  Who could've done work where there would be no exposure to temperature or humidity extremes, bright sunlight, heights, ladders, scaffolding, foot pedal manipulations, power gripping, twisting, or pounding.  And who could do work which would require only occasional bending, stooping, crouching, crawling, and twisting. Could such a person have done any of the work claimant previously did?

(Tr. 1193).

The VE testified that such a person could not perform work as a special education teacher because many times the physical requirements exceed the light exertional level. (Tr. 1194). When asked whether there would be other work in the regional or national economy for such a person, the VE testified that there were other teaching jobs in a regular classroom that such a person could perform. (Tr. 1194-95). The VE further testified that there were other unskilled occupations such a person could perform including food packager and case aide. (Tr. 1195-96).

The ALJ asked a second hypothetical question in which the VE was to assume a similar individual who was limited to lifting and carrying ten pounds occasionally, five pounds frequently. (Tr. 1196). The VE testified there were sedentary unskilled inspection jobs such a person could perform, including inspecting protective medical devices, and unskilled bench work. (Tr. 1197).

For a final hypothetical, the ALJ asked whether there would be work in the regional or national economy for a similar individual, who would be absent from the workplace more than twice a month due to pain and exacerbation. (Tr. 1198). The VE testified there would be no work such as person could do. Id.

In response to questioning by plaintiff's counsel, the VE testified that if pain medication were to cause a significant decrease in a person's pace and persistence beyond the minimal production standards, such a person would not be employable. (Tr. 1198). Furthermore, if a person's need for rest breaks and naps exceeded ten to fifteen minutes for a morning and afternoon break, and a twenty to forty-five minute lunch break, the VE testified that they would not be competitively employable. (Tr. 1199).

## V.  DISCUSSION

Plaintiff alleged three errors by the ALJ.  First, she claimed the ALJ erred by concluding that plaintiff did not meet or equal the listing for lupus without linking the finding to specific evidence.  Pl. Mem., pp. 6-7.  Specifically, plaintiff argued that although the record contains approximately 140 references to lupus, including two questionnaires from her treating rheumatologists, the ALJ never mentioned, much less evaluated the listing for lupus.  Id.

Second, plaintiff asserted the ALJ erred by not fully developing the medical record through additional evidence or clarification from Dr. Mullin or Dr. Waytz.  Pl. Mem., p. 10.

Third, plaintiff argued the ALJ improperly evaluated the credibility of her subjective complaints by placing too much emphasis on the fact that she has traveled, and by ignoring significant evidence concerning her fatigue and pain.  Pl. Mem., pp. 11, 13.

In opposition, defendant contended plaintiff's argument that the ALJ erred by concluding that plaintiff did not meet or equal the listing for lupus, Listing 14.02A and/or B, failed for several reasons.  Initially, defendant maintained that the ALJ clearly considered the impairment caused by symptoms of systemic lupus erythematosus, and determined that plaintiff did not have an impairment or impairments that met or medically equaled any listing.  Def. Mem., p. 26.  Next, defendant suggested that in any event, plaintiff waived her right to raise this issue because she failed to cite to any evidence indicating which subsection of the Listing her condition met or equaled.  Def. Mem., p. 28.  Defendant then contended that the ALJ's conclusion was supported by

two state agency reviewing physicians who determined that plaintiff's condition did not meet or equal any listed impairment.  Def. Mem., p. 28.

As to plaintiff's challenge to the RFC determination by the ALJ, defendant argued that substantial evidence supported the ALJ's RFC finding.   In support, defendant asserted that the ALJ relied on the opinions of two state agency physicians, and she properly rejected the opinions of Drs. Mullin and Waytz because the record did not contain any of Dr. Mullin's treatment records to support his conclusion, and Dr. Waytz's opinion was inconsistent with his treating records.   Def. Mem., pp. 29-31, 33-34. Defendant also rejected plaintiff's argument that the ALJ should have re-contacted Drs. Mullin and Waytz.   According to defendant, it was plaintiff's burden to prove her disability, and the ALJ had no obligation to re-contact a doctor when there was sufficient evidence in the record to reach a decision.  Id., pp. 32-34.

Finally, defendant maintained that the ALJ reasonably evaluated plaintiff's credibility taking into account her ability to travel extensively and perform other strenuous activities such as riding a jet ski and kayaking, her volunteer work, the state agency physicians' opinions, and the various notations in the medical records about plaintiff's activities.  Def. Mem., pp. 35-37.

In her Reply, plaintiff reminded the Court that she had addressed the case law and the references in the transcript to the various medical conditions relating to lupus. Pl. Reply, pp. 2-3.   Plaintiff further argued that the state agency physicians were not rheumatologists, did not examine plaintiff, and did not have access to all of the evidence regarding her chronic fatigue, including the testimony developed at the hearing and the opinions of the two treating rheumatologists, which were submitted after the hearing.

Pl. Reply, p. 2.  Plaintiff also maintained that neither of the state agency physicians upon whom the ALJ relied considered her chronic fatigue or its unpredictability when they concluded that plaintiff could work fulltime. Id., p. 4.  Instead, plaintiff submitted that the ALJ relied on her own unsupported opinion that since plaintiff traveled extensively, she could hold a full-time job.  Pl. Reply, pp. 4-5.  Plaintiff also indicated that her counsel had requested that the ALJ have a medical expert at the hearing, but the ALJ declined to do so.  Id., p. 5.

Based upon a review of the entire record as a whole, this Court concludes that plaintiff's motion for summary judgment should be granted in part and the matter remanded for further proceedings on the following grounds:  (1) the ALJ failed to make adequate findings on whether plaintiff's severe medical impairment of systemic lupus erythematosus met or equaled Listing 14.02, so as to permit this Court to determine whether substantial evidence supported the decision; and (2) the ALJ failed to fully develop the record regarding this medical condition. [34]

A.    Listing 14.02A and B

Plaintiff has the burden of proof to establish that her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  A listing is met when an impairment meets all of the listing's specified criteria.  Id. (citing Sullivan, 493 U.S. at 530, 110 S.Ct. 885 ( "An impairment that manifests only some of these criteria, no matter how severely, does not qualify.")).  A finding that a combination of

---

[34]    Having determined that plaintiff's motion for summary judgment should be granted on these grounds, the Court does not reach plaintiff's argument challenging the ALJ's evaluation of her subjective complaints.

impairments equals a listing must be based on medical evidence.  <u>Johnson</u>, 390 F.3d at

1070 (citing 20 C.F.R. § 416.926(b) (2003); <u>Sullivan</u>, 493 U.S. at 531, 110 S.Ct. 885 ("a

claimant ... must present medical findings equal in severity to *all* the criteria for the one

most similar listed impairment")).  Similarly, a finding that an impairment or combination

of impairments does not meet or equal a listing must be based on medical evidence.

<u>Shontos v. Barnhart</u>, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R.

§ 404.1526(a) and (b)).

At the same time, "it is well-settled that the 'ALJ has a duty to fully develop the

record fairly and fully, independent of the claimant's burden to press his case.'"  <u>Scott ex</u>

<u>rel. Scott v. Astrue</u>, 529 F.3d 818, 824 (8th Cir. 2008) (citing <u>Snead v. Barnhart</u>,

360 F.3d 834, 838 (8th Cir.2004)).   This duty "extends even to cases like [the

claimant's] where an attorney represented the claimant at the administrative hearing."

<u>Snead</u>, 360 F.3d at 838. (citation omitted).  As the Eighth Circuit explained in <u>Snead</u>:

> The ALJ possesses no interest in denying benefits and must act neutrally
> in developing the record. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 410,
> 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing
> examiner, furthermore, does not act as counsel. He acts as an examiner
> charged with developing the facts."); <u>Battles v. Shalala</u>, 36 F.3d 43, 44
> (8th Cir.1994) (noting that the Commissioner and claimants' counsel both
> share the goal of assuring that disabled claimants receive benefits

<u>Id.</u>

In addition to the duty to adequately develop the record, the ALJ must adequately

explain his or her factual findings in order to permit the Court to determine whether

substantial evidence supports the decision.  <u>See</u> <u>Scott ex rel. Scott</u>, 529 F.3d at 822

(citing <u>Chunn v. Barnhart</u>, 397 F.3d 667, 672 (8th Cir.2005) (remanding because the

ALJ's factual findings were insufficient for meaningful appellate review); Pettit v. Apfel, 218 F.3d 901, 903-04 (8th Cir.2000) (same)).

Plaintiff claims that her medical condition of systemic lupus erythematosus meets or equals Listing 14.02.

Listing 14.02, systemic lupus erythematosus, is met when documented as described in 14.00B1[35], with:

> A. One of the following:
>
> 1. Joint involvement, as described under the criteria in 1.00; or
>
> 2. Muscle involvement, as described under the criteria in 14.05; or
>
> 3. Ocular involvement, as described under the criteria in 2.00ff; or
>
> 4. Respiratory involvement, as described under the criteria in 3.00ff; or
>
> 5. Cardiovascular involvement, as described under the criteria in 4.00ff or 14.04D; or
>
> 6. Digestive involvement, as described under the criteria in 5.00ff; or
>
> 7. Renal involvement, as described under the criteria in 6.00ff; or

---

[35]   14.00B1 states:

1. Systemic lupus erythematosus (14.02)—This disease is characterized clinically by constitutional symptoms and signs (e.g., fever, fatigability, malaise, weight loss), multisystem involvement and, frequently, anemia, leukopenia, or thrombocytopenia. Immunologically, an array of circulating serum auto-antibodies can occur, but are highly variable in pattern. Generally the medical evidence will show that patients with this disease will fulfill The 1982 Revised Criteria for the Classification of Systemic Lupus Erythematosus of the American College of Rheumatology. (Tan, E.M., et al., Arthritis Rheum. 25: 11271-1277, 1982).

8. Hematologic involvement, as described under the criteria in 7.00ff; or

9. Skin involvement, as described under the criteria in 8.00ff; or

10. Neurological involvement, as described under the criteria in 11.00ff; or

11. Mental involvement, as described under the criteria in 12.00ff.

or

B. Lesser involvement of two or more organs/body systems listed in paragraph A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organs/body systems must be involved to at least a moderate level of severity.

Here, the record is replete with references by numerous doctors to the fact that plaintiff has been diagnosed with systemic erythematosus lupus or lupus dating back to 1975 and continuing to and after the hearing.[36]  See e.g. Tr. 189, 301, 303-04, 309, 392, 411, 413-14, 424, 450, 483, 524, 601, 603, 611, 664, 669, 671, 676-77, 688, 691, 700-01, 706-07, 747, 954, 962, 964-65, 969-70, 973-74, 976, 978, 1005, 1012-13, 1015, 1018, 1020, 1028-30, 1053-54, 1079, 1113, 1115-16, 1119, 1123, 1132, 1148-49, 1151, 1173.  Further, at the hearing, in his opening statement, plaintiff's attorney made it clear that plaintiff was claiming disability based in part on systemic erythematosus lupus, and that she was relying on Listing 14.02 for her claim.  (Tr. 1164).  In support of this claim, counsel pointed to fatigue as one of the major problems associated with systemic erythematosus lupus, and plaintiff's additional problems with her bones, joints, lungs, eyes, urinary tract and many of other separate organs and body systems.  (Tr. 1164).

---

[36]    In this regard, the Court is at a loss to understand the ALJ's reference to plaintiff's systemic lupus erythematosus as "possible systemic erythematosus lupus." (Tr. 19, 24) (emphasis added).

Plaintiff also raised the issue of meeting Listing 14.02 before she attended the hearing before the ALJ.  On March 20, 2005, her attorney, Frank W. Levin, sent a pre-hearing brief to the SSA (Tr. 126), which states in pertinent part:

> (b) Claimant's theory of disability is as follows:
>
> Claimant alleges that she is disabled by systemic lupus erythematosus, (lupus), listing 14.02, advanced degenerative disc disease, listing 1.05, vision problems, 14.02A.3, Sjogren's syndrome, see 14.00B.2, and Raynaud's disease, see 14.00B.3, chest and joint pain, 14.02A.1, muscle, back, leg, and other pain, 14.02A.2, inability to concentrate and memory loss, 14.02, A.10, and extreme and chronic fatigue, 14.02B, among other things.

Nevertheless, despite plaintiff's clear reliance on Listing 14.02, in determining that plaintiff's impairments did not meet or medically equal a listed impairment, the ALJ never cited to or referenced Listing 14.02 (or any other Listing for that matter), much less provide any explanation or analysis as to why the many references in the medical record to systemic erythematosus lupus, and its associated issues and symptoms, did not support a finding that this severe impairment met or equaled Listing 14.02.  See Scott ex rel. Scott, 529 F.3d at 823-24 (reversing and remanding the case back to the district court based on lack of evidence that the ALJ's had considered the Listing relevant to plaintiff's claim, in conjunction with his failure to cite to or reference the reports in the record he relied upon for his determination that plaintiff's impairment did not meet or equal the Listing, and the evidence supported plaintiff's claim that his impairment met the Listing).  Instead, the ALJ's sole statement on this issue was that her "review of the medical record" led her to find that plaintiff "did not have an impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 19, 24).

While it is true that "an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination", (Scott ex rel. Scott, 529 F.3d at 822 citing Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir.1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case")), on this record, the Court cannot ascertain whether the ALJ's denial of plaintiff's claim under Listing 14.02 was supported by substantial evidence. Senne, 198 F.3d at 1067.

In fact, the only "medical support" the Court can glean from the record for such a conclusion is that the state agency physicians did not check the box on the Medical Consultant Response that plaintiff met or medically equaled any medical listing. (Tr. 1011). There is no other information in the record concerning the state agency physicians' or the ALJ's analysis of whether plaintiff meets or equals a listed impairment.

Where, as here, there are many references to systemic erythematosus lupus and lupus flares in the record, and there is substantial medical evidence of involvement of a number of organs and systems under Listing 14.02A, including joint (Tr. 608, 611, 1154), ocular (Tr. 317, 321-22, 414, 450, 747, 1123, 1154), digestive (Tr. 153, 196, 274-76, 279-81, 285-86, 436-43, 1029), hematologic (Tr. 411, 700-01, 706, 1090, 1154), neurologic (Tr. 295, 662, 679, 683, 961, 964), and numerous references to fatigue (Tr. 672, 688, 690, 700, 960, 967, 1011, 1028, 1046, 1053, 1119, 1149, 1151, 1154), this Court finds that there is insufficient evidence before it to meaningfully review the ALJ's determination that plaintiff does not meet or equal any listed impairment. See

65

Scott ex rel. Scott, 529 F.3d at 823 (reversing the district court and remanding the case for further proceedings because "the ALJ failed to support his finding that [the claimant] did not meet or medically equal the severity of a listed impairment, and because the record contains inconsistencies on this issue, we are unable to determine whether substantial evidence supports the ALJ's finding that [the claimant's] impairments did not meet or medically equal listing 112.05D."); Chunn, 397 F.3d at 672 (reversing and remanding case to district court because the "ALJ failed to support his finding on step three that Chunn's impairments did not equal a listed impairment, and it is not clear from his decision that he even considered whether Chunn met the requirements for listing 12.05C"); Pettit, 218 F.3d at 903-04 (vacating judgment and remanding to district court "because the ALJ's factual findings are insufficient for our review."); Senne, 198 F.3d at 1068 (reversing and remanding where court was "unable to ascertain on this particular record whether the ALJ's denial of Mr. Senne's claim under Listing 1.13 was supported by substantial evidence"). On this basis, the Court recommends that the case be remanded to the ALJ to specifically determine whether plaintiff's severe medical impairment of systemic erythematosus lupus meets or equals Listing 14.02.

   **B.    Development of the Medical Record**

   Plaintiff also asserted the ALJ erred by not fully developing the medical record by obtaining additional evidence or clarification from Dr. Mullin or Dr. Waytz. This Court agrees.    Dr. Mullin and Dr. Waytz are plaintiff's treating rheumatologists, the specialization under which treatment for systemic erythematosus lupus falls. Of special concern is Dr. Mullin's opinion. Dr. Mullin was plaintiff's treating rheumatologist from 1975 through 2000, which covered the entire period of plaintiff's onset date through the

date last insured in March 1996.  (Tr. 1154).  Plaintiff advised the ALJ at the hearing that she had been unable to obtain Dr. Mullin's treatment records before the hearing because Dr. Mullin had retired.  (Tr. 1162-63).  However, plaintiff was able to contact Dr. Mullin after the hearing, and plaintiff submitted into the record Dr. Mullin's responses to a questionnaire from plaintiff's counsel.  The ALJ rejected Dr. Mullin's opinion, in part, because it was not accompanied by his treatment records.  (Tr. 21).

The ALJ's duty to develop the record does not extend to every circumstance where a treating physician's opinion was unclear or seemed to lack a foundation. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  Rather, the ALJ need only seek additional clarifying statements from a treating physician when a crucial issue is undeveloped.  Id.

> The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e).

Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  Where for example, plaintiff did not allege relevant medical records were missing, the Eighth Circuit has determined that the ALJ's failure to contact a physician for additional evidence was not error.  See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

In this case, however, the Court is confronted with crucial issues which have not been adequately developed by the ALJ -- i.e. whether plaintiff met or equaled the listing for systemic erythematosus lupus based on the medical records from the relevant time period, and if not, the impact of Dr. Mullin's opinions, as plaintiff's treating physician, on

67

determining plaintiff's RFC at step four.  Rather than discounting Dr. Mullin's opinions because his medical records were missing, the ALJ should have taken steps to obtain the medical records from Dr. Mullin.  Alternatively, if the records were no longer available, the ALJ should have contacted Dr. Mullin to obtain further information from him regarding his assessment that plaintiff suffered from systemic erythematosus lupus, along with associated conditions of arthralgia, back and neck pain, osteoporosis, Raynaud's phenomenon, postural hypotension, corneal dystrophy, Sjogren's syndrome, chest wall pain, and fibromyalgia, and symptoms of chronic pain in her back and extremities, fatigue, cold extremities, confused thinking, multiple instances of anemia, and GI bleeding.  (Tr. 1154).  In addition, if Dr. Mullin's records could not be obtained, the ALJ should have sought clarification from Dr. Mullin regarding his opinion that plaintiff could not perform sedentary work on a full-time basis, and the basis for his opinions regarding plaintiff's unscheduled absences and need for breaks.  (Tr. 1155). Having failed to adequately develop the record to perform the analysis at step three, and if necessary at step four, this case must be remanded back to the ALJ for further development and analysis.

In summary, the Court notes that systemic erythematosus lupus is "a chronic, relapsing inflammatory disease that attacks connective tissues and is characterized by a wide range of symptoms, including arthritis, pain in the joints, kidney and blood disorders, skin eruptions, and fever."  Gude v. Sullivan, 956 F2d 791, 792 (8th Cir. 1992) (citing Dorland's Illustrated Medical Dictionary 958 (27th ed. 1988)).  It is "chronic and relapsing with long periods of remission and is totally unpredictable."  Id., at 794 (citing Merck Manual of Diagnosis and Therapy 1275-76 (Robert Berkow, M.D. et al.

eds.) (15th ed. 1987)).  Based on the nature of the illness, it is important that the record be fully developed with substantive information regarding plaintiff's progression with the disease from the treating rheumatologist, Dr. Mullin, for the years of 1987 through1996, and thereafter, particularly where numerous doctors other than Dr. Mullin, during and after this period have indicated that plaintiff suffered from, and continued to exhibit conditions and symptoms associated with the disease.  This information can be obtained from Dr. Mullin's records or from Dr. Mullin himself.  Regardless of how the information is developed, however, it is clear that it is critical to determining whether plaintiff's systemic erythematosus lupus met or equaled Listing 14.02, and if not, to the ALJ's development of plaintiff's RFC at step four.

## VI.    CONCLUSION

For the reasons discussed above, the Court concludes that the ALJ's decision to deny plaintiff's application for SSI benefits cannot be upheld.  Consequently, the ALJ must fulfill her responsibility to fully develop the record in the manner prescribed by the SSA Regulations and Eighth Circuit case law.  Therefore, it is recommended that plaintiff's motion for summary judgment be granted in part and denied in part.  Plaintiff's request for an immediate award of benefits should be denied.  However, the ALJ's decision should be vacated.  It is also recommended that the defendant's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings.  On remand, the ALJ should be directed to do the following:

First, fully develop the record with respect to plaintiff's systemic erythematosus lupus by either obtaining the medical records of Dr. Gerald Mullin or contacting

Dr. Mullin regarding his treatment of plaintiff for consideration of whether this severe impairment met Listing 14.02 during the relevant time period.

Second, fully analyze and explain her reasoning for finding that the severe impairment of systemic erythematosus lupus did or did not meet or equal Listing 14.02.

Third, if the ALJ determines that the severe impairment of systemic erythematosus lupus did not meet or equal Listing 14.02, then she should determine plaintiff's RFC at step four in light of the fully developed record.  In this regard, in evaluating plaintiff's subjective complaints of disabling pain, the ALJ should give full consideration to the information obtained from Dr. Mullin or his records, in conjunction with the balance of the record.

Fourth, if the ALJ still concludes, after considering the new, fully-developed, medical record, that the treating physician's opinions and plaintiff's subjective complaints of disabling pain should be discounted, the ALJ should fully explain her position on those matters in light of the new record.

Finally, because the hypothetical questions posed to the vocational expert may be based upon a faulty determination of plaintiff's RFC, the vocational expert's answers to those questions cannot constitute sufficient evidence that plaintiff was able to engage in substantial gainful employment.  See Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998).  Consequently, if the ALJ revises her final RFC determination, she should solicit new testimony from a vocational expert in order to determine whether, at step five of the evaluation process, there are any jobs that plaintiff could perform given the ALJ's post-remand RFC determination.  See Jenkins v. Apfel, 196 F.2d 922, 925 (8th Cir. 1999)

(where a vocational expert's opinion is predicated on a faulty RFC determination, the

ALJ cannot rely on that opinion); <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).

## VII.   RECOMMENDATION

IT IS HEREBY RECOMMENDED THAT:

1.   Plaintiff's Motion for Summary Judgment [Docket No. 8] be granted in part and denied in part;

2.   Defendant's Motion for Summary Judgment [Docket No. 11] be denied; and

3.   This case be remanded to the SSA for further proceedings consistent with this Report & Recommendation.

Dated :  August 6, 2008

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 25, 2008, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.